# IN THE SUPREME COURT OF CALIFORNIA

TINA TURRIETA,
Plaintiff and Respondent,

v.

LYFT, INC.,
Defendant and Respondent;
MILLION SEIFU et al.,
Movants and Appellants.

S271721

Second Appellate District, Division Four
B304701

Los Angeles County Superior Court
BC714153

August 1, 2024

Justice Jenkins authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Kruger, and Groban concurred.

Justice Kruger filed a concurring opinion, in which Justice Groban concurred.

Justice Liu filed a dissenting opinion in which, Justice Evans concurred.

TURRIETA v. LYFT, INC.

S271721

Opinion of the Court by Jenkins, J.

The California Labor and Workforce Development Agency (LWDA) has statutory authority to collect civil penalties from employers that violate certain provisions of the Labor Code. The Labor Code Private Attorneys General Act of 2004 (PAGA) (Lab. Code, § 2698 et seq.)[1] authorizes "aggrieved" employees (§ 2699, subd. (a)) — defined in part as "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed" (§ 2699, subd. (c)(1)) — to bring an action to recover the civil penalties on the state's behalf after the LWDA, having been notified of the alleged violations, declines to pursue them (*id.*, subd. (a); § 2699.3). In such actions, the LWDA generally receives the majority of any recovered penalties and "the aggrieved employees" receive the remaining amount.

This case involves what has become a common scenario in PAGA litigation: multiple persons claiming to be an "aggrieved employee" within the meaning of PAGA file separate and independent lawsuits seeking recovery of civil penalties from the same employer for the same alleged Labor Code violations. Tina Turrieta, Brandon Olson, and Million Seifu each worked as a driver for Lyft, Inc. (Lyft) and each filed a separate action seeking civil penalties under PAGA for Lyft's alleged failure to

---

[1]     All further unlabeled statutory references are to the Labor Code.

1

pay minimum wages, overtime premiums, and business expense reimbursements. In early December 2019, Turrieta and Lyft signed an agreement settling Turrieta's action and scheduled a settlement approval hearing for January 2, 2020. Before that hearing, Olson and Seifu filed separate motions to intervene in Turrieta's action and submitted objections to the settlement. The trial court denied the motions, approved the settlement, and later denied the motions of Olson and Seifu to vacate the judgment.

Olson and Seifu appealed, challenging both the settlement and the denials of their various motions. The Court of Appeal affirmed, finding that the trial court had properly denied the intervention motions and that Olson and Seifu lacked standing to move in the trial court to vacate the judgment or to challenge the judgment on appeal. Olson petitioned for our review of the appellate court's decision, asserting that as a deputized agent of the state under PAGA, he has the right, on behalf of the state, to intervene in Turrieta's action, to move to vacate the judgment in that action, and to have the court consider his objections to the proposed settlement of that action.

We agree with the Court of Appeal. PAGA provides that an aggrieved employee, after complying with specified procedural prerequisites, may "commence a civil action" to recover civil penalties that the LWDA may assess and collect. (§ 2699.3, subd. (a)(2)(A).) Although a PAGA plaintiff may use the ordinary tools of civil litigation that are consistent with the statutory authorization to commence an action, such as taking discovery, filing motions, and attending trial, we conclude for reasons explained below that the authority Olson seeks in this case — to intervene in the ongoing PAGA action of another plaintiff asserting overlapping claims, to require a court to

consider objections to a proposed settlement in that overlapping action, and to move to vacate the judgment in that action — would be inconsistent with the scheme the Legislature enacted. This conclusion best comports with the relevant provisions of PAGA as read in their statutory context, in light of PAGA's legislative history, and in consideration of the consequences that would follow from adopting Olson's contrary interpretation. We therefore affirm the Court of Appeal's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 8, 2018, Turrieta sent notice to the LWDA of "representative claims" she wanted to bring under PAGA based on Lyft's alleged violation of several "provisions of the Labor Code." Accompanying the notice was a draft complaint identifying Turrieta as a Lyft driver and seeking, "as a Private Attorney General on behalf of the State of California with regard to current and former Lyft Drivers," "relief recoverable under" PAGA based on Lyft's alleged "willful misclassification of its Driver Employees as independent contractors." In separate causes of action, the draft complaint alleged the following violations of the Labor Code: (1) willfully misclassifying drivers as independent contractors; (2) intentionally failing to pay overtime premiums; (3) failing to timely pay wages; (4) failing to pay wages due upon termination; (5) failing to provide itemized wage statements; and (6) failing to provide equipment or reimburse business expenses. On July 13, 2018, Turrieta filed the complaint in the Los Angeles Superior Court.

In late May 2018, Olson filed a class action complaint against Lyft in the San Francisco Superior Court. About the same time, he sent notice to the LWDA of PAGA claims he wanted to pursue against Lyft. Almost two months later, in

August 2018, he added those PAGA claims to his pending class action by filing an amended complaint seeking penalties under PAGA based on his status as a Lyft driver and alleging that Lyft had misclassified drivers as independent contractors and had failed to reimburse business expenses, to pay overtime, to pay minimum wages, to provide adequate wage statements, and to provide required meal and rest breaks.

In April 2019, Olson filed in the San Francisco Superior Court a petition under Code of Civil Procedure section 404.1 to coordinate his action with Turrieta's action and with three others asserting misclassification claims against Lyft, including one filed by Seifu in Los Angeles Superior Court on July 5, 2018. In June 2019, the court denied the petition "without prejudice," reasoning that coordination would not " 'promote the ends of justice' " given that four of the actions in question —including Turrieta's, Olson's, and Seifu's — had been "stayed for all purposes." Olson could have challenged the denial order by petitioning for a writ of mandate (Code Civ. Proc., § 404.6), but he did not do so. Nor at that time did he seek to intervene in Turrieta's action.

In September 2019, Turrieta and Lyft attended a mediation. When they failed to reach agreement, the mediator made a settlement proposal based on his valuation of the case, and the parties accepted the proposal. Among other things, the settlement agreement provided as follows: "[T]he Parties agree that they will cooperate in the sending of an amended PAGA letter to the LWDA . . . and in the drafting and filing of an amended complaint that covers all PAGA claims that could have been brought against Lyft so that PAGA Settlement Group Member Release covers all potential PAGA claims described in this paragraph. Specifically, the amended complaint shall add

the following causes of action:  Labor Code sections 226.7, 353, 510, 512, 554, 1174, 1174.5, 1182.12, 1194, 1194.2, 1197, 1197.1, 1198, 1199, 2802, 2810.5, and Paragraphs 4, 7, and 10–12 of Wage Order #9-2001.  Plaintiff shall provide notice of the settlement to the LWDA after the long-form settlement agreement is executed and the motion for approval is filed."

On December 9, 2019, Turrieta filed a motion for court approval of the settlement, with a hearing set for January 2, 2020.  Along with the motion, Turrieta submitted a proposed amended complaint reflecting the terms of the settlement agreement and a request for approval of the amended complaint's filing.  The same day, she sent to the LWDA copies of the proposed settlement agreement, the approval motion, and related filings, including the proposed amended complaint.

The LWDA did not file an opposition or objection to the proposed settlement.  However, on December 24, 2019, Olson filed a pleading in Turrieta's action seeking a court order:  (1) granting leave to file a complaint in intervention and to intervene; and (2) denying approval of the proposed settlement or continuing the January 2 approval hearing "until such time as [his intervention] motion [could] be heard."  Olson simultaneously submitted a proposed complaint in intervention alleging the same Labor Code violations he had previously alleged in his separate PAGA action.  In the proposed complaint's Prayer for Relief, Olson requested, among other things, "Designation of [his] counsel of record as Lead Counsel for the Aggrieved Employees," "Costs of suit," "Appropriate service payments to Plaintiff for his service as a PAGA representative[]," and "Attorneys' fees, pursuant to PAGA, Code of Civil Procedure § 1021.5, and all other bases for fees in the Labor Code."

Two days later, on December 26, 2019, Olson filed an ex parte application for an order rescheduling the approval hearing from January 2, 2020, to a date on which the court could concurrently hear his motion to intervene. The court denied the application, finding "no exigent circumstances" to support it and stating that Olson lacked "standing to be heard on the appropriateness of the settlement." On December 31, 2019, Seifu also requested postponement of the approval hearing. At the same time, he moved to intervene and filed an objection to the settlement.

At the approval hearing on January 2, 2020, the court "overruled" Seifu's objection because: (1) it "was filed on the eve of the hearing"; and (2) Seifu, like Olson, lacked "standing to be heard on this matter." The court also approved the settlement, finding it "to be fair, adequate and reasonable." Relatedly, the court expressly "disagree[d] with" Seifu's assertion "that Lyft engaged in gamesmanship such that plaintiffs in other cases (as well as the State) could be shortchanged," explaining: "[A]fter the parties engaged in mediation before a very experienced mediator, they were still not able to arrive at a resolution. Instead, they ultimately accepted the mediator's proposal." On January 6, 2020, the court entered a final judgment consistent with its ruling and the approved settlement.

Olson and Seifu each filed a motion to vacate the judgment pursuant to Code of Civil Procedure section 663. The court denied the motions, affirming its earlier conclusion that the settlement was "in the best interest of [both] the workers and . . . the State of California," and stating that Seifu and Olson lacked "standing to object" or "to bring a motion to set aside the judgment." The court later issued a minute order stating: "On the Court's own motion, the Hearing on Motion for

Leave to Intervene . . . scheduled for 04/07/2020 is advanced to this date and vacated."

Olson and Seifu appealed from the trial court's ruling, and the Court of Appeal affirmed. Regarding the motions to vacate, it held that Olson and Seifu "lacked standing . . . to bring" such a motion in the trial court — and thus to appeal from the judgment — because they could not establish a threshold standing requirement: that they were " 'aggrieved' by the judgment." (*Turrieta v. Lyft, Inc.* (2021) 69 Cal.App.5th 955, 970 (*Turrieta*).) Their "role as PAGA plaintiffs" in their separate PAGA actions, the Court of Appeal reasoned, did not "confer[] upon them a personal interest in the settlement of another PAGA claim" because " '[a] PAGA claim is legally and conceptually different from an employee's own suit for damages and statutory penalties. An employee suing under PAGA "does so as the proxy or agent of the state's labor law enforcement agencies." ' [Citation.] As such, '[e]very PAGA claim is "a dispute between an employer and the state." [Citations.] . . . Relief under PAGA is designed primarily to benefit the general public, not the party bringing the action.' [Citations.] ' "A PAGA representative action is therefore a type of qui tam action," ' and the ' "government entity on whose behalf the plaintiff files suit is always the real party in interest." ' " (*Turrieta*, at pp. 971–972.) "Because it is the state's rights, and not [those of Olson and Seifu], that are affected by a parallel PAGA settlement, [Olson and Seifu] are not aggrieved parties with standing to seek to vacate the judgment or appeal. Nor can [they] claim a pecuniary interest in the penalties at issue, as the 'civil penalties recovered on the state's behalf are intended to "remediate present violations and deter future ones," not to redress employees' injuries.' " (*Id.* at p. 972, fn. omitted.)

Turning to the intervention motions, the Court of Appeal ruled that Olson and Seifu could not "meet the threshold" requirement under Code of Civil Procedure section 387 for either mandatory or permissive intervention: "[A] direct and immediate interest in the settlement." (*Turrieta, supra*, 69 Cal.App.5th at p. 977.) For reasons similar to those related to their lack of standing, the court explained, their "position as PAGA plaintiffs in different PAGA actions does not create a direct interest in [Turrieta's action], in which they are not real parties in interest. [Their] interest in pursuing enforcement of PAGA claims on behalf of the state cannot supersede the same interest held by Turrieta in her own PAGA case. . . . [They] have no personal interest in the PAGA claims and any individual rights they have would not be precluded under the PAGA settlement." (*Id.* at p. 977.)

Olson timely filed a petition for review of the Court of Appeal's ruling, which we granted, limiting the issue for consideration to the following: "Does a plaintiff in a representative action filed under [PAGA] have the right to intervene, or object to, or move to vacate, a judgment in a related action that purports to settle the claims that plaintiff has brought on behalf of the State?"[2] For reasons explained below,

---

[2] In his petition, Olson asked that we also consider the following issues: (1) whether PAGA plaintiffs lack authority to prosecute and settle PAGA claims before satisfying the PAGA notice requirements set forth in section 2699.3, subdivision (a); (2) whether trial courts lack jurisdiction to approve settlements that release PAGA claims as to which the PAGA plaintiff has not satisfied notice requirements; and (3) whether trial courts, before approving proposed PAGA settlements, must independently determine whether the proposed settlement is fair, adequate, reasonable, and advances PAGA's public purposes. Seifu did not timely file a petition for review.

we answer this question in the negative and affirm the Court of Appeal's judgment.

## DISCUSSION

In recent years, we have addressed several issues related to PAGA litigation. We begin with a review of the basic principles set forth in our prior PAGA decisions because they provide context for deciding the issues now before us.

The Legislature enacted PAGA in 2003 to address a perceived "shortage of government resources to pursue enforcement" of the Labor Code. (*Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 379 (*Iskanian*).) In the uncodified, first section of the 2003 legislation, the Legislature "declare[d]" that "the only meaningful deterrent to unlawful conduct" in many cases "is the vigorous assessment and collection of civil penalties as provided in the Labor Code," and that in light of declining "[s]taffing levels for state labor law enforcement agencies," it was "in the public interest to provide that [such] civil penalties . . . may also be assessed and collected by aggrieved employees acting as private attorneys general." (Stats. 2003, ch. 906, § 1, subds. (b)–(d).) Thus, "the Legislature's purpose in enacting the PAGA was to augment" what the Legislature then viewed as a "limited enforcement capability" of the LWDA "by empowering employees to enforce the Labor Code as representatives of the Agency." (*Iskanian*, at p. 383.)

To achieve this purpose, PAGA, as it applies in this case, specifies that civil penalties recoverable by the LWDA "may, as

Through counsel, he requested permission to file a late petition. We denied the request.

an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself and other current or former employees pursuant to" specified procedures. (§ 2699, former subd. (a).)[3] This provision "empowers" aggrieved employees to sue for "civil penalties previously recoverable only by the Labor Commissioner." (*ZB, N.A. v. Superior Court* (2019) 8 Cal.5th 175, 185 (*ZB*).) For purposes of standing to bring a PAGA action, an "aggrieved employee" is "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed." (§ 2699, former subd. (c).) As here relevant, "civil penalties recovered by aggrieved employees are distributed as follows: 75 percent to the [LWDA] . . . and 25 percent to the aggrieved employees." (*Id.*, former subd. (i).)

Our previous decisions highlight several important "legal characteristics" of PAGA actions. (*Iskanian*, *supra*, 59 Cal.4th at p. 380.) " '[E]*very* PAGA action . . . is a representative action on behalf of the state.' " (*Id.* at p. 387.) "It is a dispute between an employer and the *state*," in which the state alleges "through its agents" — i.e., aggrieved employees — "that the employer has violated the Labor Code." (*Id.* at pp. 386–387.) It "is an enforcement action between the LWDA and the employer, with the PAGA plaintiff acting on behalf of the government." (*Kim v.*

---

[3] After oral argument in this case, the Legislature enacted extensive amendments to the PAGA statutes. (Stats. 2024, ch. 44, § 1 [enacting Assembly Bill No. 2288, effective Jul. 1, 2024]; *id.*, ch. 45, § 1 [enacting Senate Bill No. 92, effective Jul. 1, 2024].) The amendments are not at issue and no party suggests they should apply here. Our discussion addresses versions of the PAGA statutes in effect throughout the litigation of this case, and we express no opinion on operation of the newly amended provisions.

*Reins Internat. Cal., Inc.* (2020) 9 Cal.5th 73, 86 (*Kim*).) As such, a PAGA action "functions as a substitute for an action brought by the government itself." (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 986 (*Arias*).)

An aggrieved employee who files a representative PAGA action is asserting a "claim[] belonging to a government agency" (*Iskanian, supra,* 59 Cal.4th at p. 388) and "represents the same legal right and interest as state labor law enforcement agencies — namely, recovery of civil penalties that otherwise would have been assessed and collected by" the LWDA (*Arias, supra,* 46 Cal.4th at p. 986). Thus, the employee-plaintiff sues "as the state's authorized representative" (*Kim, supra,* 9 Cal.5th at p. 80) — its "*'proxy or agent'*" (*id.* at p. 81). A PAGA plaintiff's "status as 'the proxy or agent' of the state [citation] is not merely semantic; it reflects a PAGA litigant's substantive role in enforcing [California's] labor laws on behalf of state law enforcement agencies." (*Iskanian,* at p. 388.) "The government entity on whose behalf the plaintiff files suit is always the real party in interest in the suit." (*Id.* at p. 382.) These legal characteristics make "[a] PAGA representative action . . . a type of qui tam action." (*Ibid.*)

Consistent with their representative relationship to the state, aggrieved employees must, before filing a PAGA action in court, give written notice of any alleged Labor Code violations to both their employer and the LWDA, and the notice must describe the facts and theories supporting the alleged violations. (§ 2699.3, former subd. (a)(1)(A).) If the LWDA notifies the employee and the employer that it does not intend to investigate the alleged violations, or if it fails to respond within 65 days, then the employee "may commence a civil action" against the employer. (§ 2699.3, former subd. (a)(2)(A).) If the LWDA

decides to investigate, it then has 120 days to do so. (§ 2699.3, former subd. (a)(2)(B).) If, after undertaking an investigation, the LWDA decides not to issue a citation or does not issue one within specified time limits, the employee "may commence a civil action." (*Ibid.*)

As to whether PAGA allows multiple, overlapping representative actions filed by different aggrieved employees against the same employer based on the same facts and theories, one federal court observed in 2016 that PAGA's " 'express terms' " do not address the question. (*Tan v. Grubhub, Inc.* (N.D.Cal. 2016) 171 F.Supp.3d 998, 1013 (*Tan*).) Citing the federal court's observation, a California appellate court stated in *Julian v. Glenair, Inc.* (2017) 17 Cal.App.5th 853, 866, that "nothing in the PAGA statutory scheme forecloses separate but similar actions by different employees against the same employer." Based on *Julian*, the Court of Appeal in this case held that "[o]verlapping PAGA actions may be brought by different employees who allege the same violations and use the same theories." (*Turrieta, supra*, 69 Cal.App.5th at p. 969.) The parties do not contest this point and we assume, for purposes of deciding this case, that overlapping PAGA actions are permissible.[4]

---

[4] By contrast, PAGA expressly precludes an aggrieved employee from bringing a PAGA action "if the [LWDA] or any of its departments, divisions, commissions, boards, agencies, or employees, on the same facts and theories, cites a person within the timeframes set forth in Section 2699.3 for a violation of the same section or sections of the Labor Code under which the aggrieved employee is attempting to recover a civil penalty on behalf of himself or herself or others or initiates a proceeding pursuant to Section 98.3." (§ 2699, former subd. (h); see § 2699, subdivision (*l*) [same].)

Several PAGA provisions expressly provide for the LWDA's involvement in an aggrieved employee's pending PAGA action. For cases filed on or after July 1, 2016, a PAGA plaintiff "shall, within 10 days following commencement of a civil [PAGA] action," "provide the [LWDA] with a file-stamped copy of the complaint." (§ 2699, former subd. (*l*)(1).) If a PAGA plaintiff and the defendant agree to settle the action, then "[t]he proposed settlement [must] be submitted to the [LWDA] at the same time that it is submitted to the court" for review and approval. (§ 2699, former subd. (*l*)(2).)[5] As to involvement in a PAGA plaintiff's pending PAGA action by anyone else, PAGA, under the provisions applicable here, is silent.

With this general background in mind, we turn to Olson's claims.

## I. Intervention

Olson argues that, under the general intervention statute — section 387 of the Code of Civil Procedure (section 387) — he was entitled to intervene in Turrieta's action as a deputy of the state. Subdivision (d)(1) of section 387, which sets forth what is known as mandatory intervention or intervention as a matter of right, provides that a court "shall, upon timely application, permit a nonparty to intervene in the action or proceeding if," as here relevant, "[t]he person seeking intervention claims an interest relating to the property or transaction that is the subject of the action and that person is so situated that the disposition of the action may impair or impede that person's ability to protect that interest, unless that person's

---

[5] Provisions identical to section 2699, former subdivisions (*l*)(1) and (*l*)(2) now appear as section 2699, subdivisions (s)(1) and (s)(2).

interest is adequately represented by one or more of the existing parties." Subdivision (d)(2) of section 387, which sets forth what is known as permissive intervention, provides that "[t]he court may, upon timely application, permit a nonparty to intervene in the action or proceeding if the person has an interest in the matter in litigation, or in the success of either of the parties, or an interest against both." Olson contends he meets the requirements of *both* subdivisions and the trial court thus erred by denying his intervention motion.

In asserting he has the requisite "interest" for intervention under section 387, Olson expressly disclaims reliance on any "personal interest" in his *individual* capacity. Instead, he relies exclusively on "*the State's* interest" and his status "as the State's *proxy*."[6] (Italics added.) According to Olson, the state has "an immediate and substantial right in the claims that Turrieta" is pursuing and now "purports to settle." The state, Olson asserts, has "deputized" him to "prosecute" identical claims in his own PAGA action and, as to those claims, has "imbued [him] with the authority to act on behalf of the State." As such, the state interest he "represents . . . necessarily extends to how those

---

[6] In his reply brief, Olson states that "he does not claim a personal interest" in Turrieta's action or argue he has a "personal interest sufficient to justify intervention." Consistent with this statement, he criticizes the Court of Appeal for characterizing his "interests as 'personal,'" asserting that: (1) this characterization "directly conflicts with the reasoning, if not the explicit holdings, of" this court's decisions; (2) he "never argue[d]" below he had a personal interest in Turrieta's action; and (3) at no "point did [he] become something *other* than an agent of the State." Given Olson's statements, we express no opinion on whether a PAGA plaintiff has a personal interest that may satisfy the "interest" requirement for intervention under section 387.

claims are resolved in [Turrieta's] parallel PAGA action, by which the State will be bound by any judgment." Therefore, "as the State's proxy," he has both the authority and "responsibility" to protect "the State's interest" and "may intervene" in Turrieta's PAGA action as is "necessary to protect" that interest." Supporting this view, Olson asserts, are two Court of Appeal decisions: *Moniz v. Adecco USA, Inc.* (2022) 72 Cal.App.5th 56, 73 (*Moniz*) and *Uribe v. Crown Bldg. Maint. Co.* (2021) 70 Cal.App.5th 986 (*Uribe*).[7]

Turrieta and Lyft disagree with Olson. They assert that PAGA does not authorize him to intervene in the PAGA action of another PAGA plaintiff asserting identical claims. According to Turrieta, section 2699, subdivision (a), "defines the rights bestowed upon a PAGA litigant" and its "plain language . . . provides [only] a limited authorization for employees to bring an action to recover civil penalties." "That is it. No other rights are listed." Lyft offers this similar argument: "A PAGA plaintiff like Olson derives his authority to act as the state's proxy solely from a statutory delegation: if an aggrieved employee follows certain statutory procedures, he or she 'may commence a civil action pursuant to [Labor Code] [s]ection 2699.' (Lab. Code,

---

[7]     According to Olson, "the State's interests here are particularly strong because Turrieta has settled claims she was never deputized to pursue . . . and is therefore not authorized to prosecute as the State's proxy." The Court of Appeal declined to consider Olson's assertion that Turrieta settled claims she was not deputized to pursue, concluding that Olson forfeited the issue by failing to properly raise it in the trial court. (*Turrieta, supra,* 69 Cal.App.5th at p. 973, fn. 14.) Olson asked us to review this issue, but it is beyond the scope of the issue we identified in our order granting review. (See *ante,* p. 8, fn. 2.) We therefore do not further discuss Olson's assertion that Turrieta settled claims she was not authorized to pursue.

§ 2699.3, [former] subd. (a)(2)(A).) That statutory delegation of authority is obviously limited to that proxy's 'action.' Nothing in this statutory scheme suggests that 'commenc[ing]' a PAGA action includes intervening in a different PAGA action."

Olson, in response, concedes that PAGA's text "does not explicitly provide for" intervention in an overlapping PAGA action by someone who has been separately "deputized" to bring identical claims. But, he asserts, the fact that no such "right to intervene . . . exist[s] within the PAGA statute itself" is irrelevant because "[t]hat right [separately] exists in well-established California civil procedure," specifically, section 387. In Olson's view, "[c]ases are legion recognizing an aggrieved party's right to intervene if that party is able to meet the qualifications for intervention under" section 387, and "nothing in the language of" PAGA establishes "an exclusion from" this "traditional civil procedure rule[]" or "operates as a complete bar to participation as an intervenor . . . , according to the standards set forth in California civil procedure." To conclude otherwise, Olson asserts, would violate the rule that " '[a] court may not, under the guise of construction, rewrite the law or give the words an effect different from the plain and direct import of the terms used.' " Olson further asserts that "constru[ing]" PAGA's text "narrowly" as Turrieta suggests — conferring on him "only [the] right . . . to proceed apace with his own PAGA action, no matter how, when or why the claims he has been deputized to pursue may otherwise be compromised" — would be "antithetical to PAGA's aims."[8]

---

[8] Relatedly, Amicus Curiae California Employment Lawyers Association, in support of Olson, asserts that "[t]he public interest [would be] far better served by permitting a plaintiff in an overlapping PAGA case to object to a settlement

These differing views reflect fundamental disagreement about, as Olson puts it, "the scope of a duly deputized plaintiff's right to prosecute and resolve claims brought on behalf of the State in a PAGA action." Before PAGA's enactment, civil penalties for Labor Code violations could be pursued and recovered " 'only by the state's labor law enforcement agencies.' " (*Iskanian*, *supra*, 59 Cal.4th at p. 381.) Our prior decisions have generally described PAGA as "simply a procedural statute" that "allow[s] an aggrieved employee to recover" those civil penalties "as the proxy or agent of state labor law enforcement agencies" (*Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court* (2009) 46 Cal.4th 993, 1003 (*Amalgamated*)), i.e., "as the state's authorized representative" (*Kim*, *supra*, 9 Cal.5th at p. 80). This broad description of a PAGA plaintiff's status does little to establish or define the scope of a PAGA plaintiff's authority to act on the state's behalf, either in general or with respect to the specific question here: may a PAGA plaintiff, based solely on the state's interest, intervene in the action of another PAGA plaintiff who is representing the same state interest as to overlapping claims. For example, in *Amalgamated*, *supra*, 46 Cal.4th at page 1003, we held that PAGA plaintiffs, although acting "as the proxy or agent of state labor law enforcement agencies" and "representing the same legal right and interest as those agencies," have no right or authority to "assign" the PAGA claims they have been authorized to bring. And in *ZB*, *supra*, 8 Cal.5th at page 182, we held that "the civil penalties a plaintiff may seek under section 558 through the PAGA do not include the 'amount

---

extinguishing that plaintiff's case, and to become a party with standing to appeal through intervention or moving to vacate a judgment."

sufficient to recover underpaid wages,' " even though "the Labor Commissioner [may] recover such an amount."

The dissent reads our prior decisions differently. In its view, our previous characterization of a PAGA plaintiff "as a *representative* of the state's labor law enforcement agencies" settles the issue. (Dis. opn. of Liu, J., *post*, at p. 5, italics added.) Based on that characterization, the dissent declares, it is "clear" that Olson and others like him may "assert[] the *state's interest* in intervening in" the PAGA action "of another plaintiff prosecuting the same or overlapping claims." (Dis. opn. of Liu, J., *post*, at pp. 5–6.)

For several reasons, we disagree. First, the term "representative" is just one of several terms we have used in generally describing the role of a PAGA plaintiff. As earlier explained, we have simultaneously described a PAGA plaintiff as the state's "agent" or "proxy." (*Arias*, *supra*, 46 Cal.4th at p. 986 ["An employee plaintiff suing" under PAGA "does so as the proxy or agent of the state's labor law enforcement agencies"]; *Amalgamated*, *supra*, 46 Cal.4th at p. 1003 [aggrieved employee bringing a PAGA action "acts as the proxy or agent of state labor law enforcement agencies"].) The dissent rejects *any* analysis based on our prior use of the word "agent" to describe a PAGA plaintiff's relationship to the state. (Dis. opn. of Liu, J., *post*, at p. 16.) Yet, without analysis or explanation, the dissent relies entirely on our simultaneous and alternative use of the word "representative" as the basis for concluding that a PAGA plaintiff has a "right" to "assert[] the *state's interest* in intervening in" the PAGA action "of another plaintiff prosecuting the same or overlapping claims." (Dis. opn. of Liu, J., *post*, at p. 6.)

Second, in using the word "representative" to generally describe the role of a PAGA plaintiff, we did not establish, define, or address the precise scope of a PAGA plaintiff's authority to act on the state's behalf. Rather, we used the word in a very general "sense" to convey the idea that the action of a PAGA plaintiff is brought "on the state's behalf." (*ZB*, *supra*, 8 Cal.5th at p. 185 ["All PAGA claims are 'representative' actions in the sense that they are brought on the state's behalf"]; see *Iskanian*, *supra*, 59 Cal.4th at p. 387 [" 'every PAGA action . . . is a representative action on behalf of the state' "].) Moreover, as noted above, our prior decisions are inconsistent with the dissent's apparent view that a PAGA plaintiff's authority as the state's representative is essentially coextensive with the state's own authority. (See *Amalgamated*, *supra*, 46 Cal.4th at p. 1003 [PAGA plaintiffs have no right or authority to "assign" PAGA claims they have been authorized to bring]; *ZB*, *supra*, 8 Cal.5th at p. 182 [PAGA plaintiffs may not recover "the 'amount sufficient to recover underpaid wages' " even though "the Labor Commissioner [may] recover such an amount"].)

Indeed, consistent with these decisions, Olson agrees that he is not authorized under PAGA to "act 'on the State's behalf for all purposes' " or to exercise "the sweep of the LWDA's entire authority." Instead, he acknowledges that the fundamental "question" to be answered here is whether "the scope of" his authority under PAGA, as someone "duly deputized . . . to prosecute and resolve [PAGA] claims brought on behalf of the State," includes seeking intervention, based exclusively on the interests of the state, in "the prosecution of [a] parallel action[] involving overlapping claims." If not, then Olson is not, as he

asserts, "able to meet the qualifications for intervention under" section 387 based on any interest of the state.[9]

In resolving this issue, " 'our fundamental task,' " as with any question of statutory interpretation, " 'is to determine the Legislature's intent so as to effectuate the law's purpose.' [Citation.] 'We begin by examining the statutory language, giving it a plain and commonsense meaning. [Citation.] We do not, however, consider the statutory language in isolation; rather, we look to the entire substance of the statutes in order to determine their scope and purposes. [Citation.] That is, we construe the words in question in context, keeping in mind the statutes' nature and obvious purposes. [Citation.] We must harmonize the various parts of the enactments by considering them in the context of the statutory [framework] as a whole. [Citation.] If the statutory language is unambiguous, then its plain meaning controls. If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history.' "[10]     (*Skidgel v. California Unemployment Ins. Appeals Bd.* (2021) 12 Cal.5th 1, 14.)

---

[9]     Turrieta and Lyft alternatively argue that Olson may not assert the state's right to intervene because the state itself has no such right. They reason: Section 387, subdivision (b), by its terms, authorizes intervention only by "a nonparty." The state is not a nonparty; it is already a party through its proxy, Turrieta, or is the real party in interest represented by Turrieta. Because we conclude the scope of Olson's authority does not include the right to seek intervention on the state's behalf, we need not discuss this argument.

[10]     According to the dissent, considering whether the scope of Olson's authority under the terms of PAGA includes the power to assert any state right of intervention is "start[ing] in the wrong place." (Dis. opn. of Liu, J., *post*, at p. 1.) But it is the

## A. The Statutory Language

Turning first to the statutory language, we begin with Olson's acknowledgement that PAGA's text "does not explicitly provide for" intervention in a PAGA action by someone who has filed a separate PAGA action asserting overlapping claims. Indeed, PAGA's provisions speak only in general terms. Section 2699, former subdivision (a), states that civil penalties prescribed by other statutes may "be recovered through a civil action brought by an aggrieved employee . . . pursuant to the procedures specified in Section 2699.3." Former subdivision (g)(1) of section 2699 states that "an aggrieved employee may recover the civil penalty described in [former] subdivision (f) in a civil action pursuant to the procedures specified in Section 2699.3." Section 2699.3 in turn states in several subdivisions that an "aggrieved employee may commence a civil action pursuant to Section 2699" upon the occurrence or nonoccurrence of certain acts by the LWDA. (§ 2699.3, former subds. (a)(2)(A)– (B), (c)(2)(A).) Section 2699.3 otherwise states that "[a] civil action by an aggrieved employee pursuant to . . . Section 2699 . . . shall commence only after [the specified] requirements have been met" (§ 2699.3, former subd. (a); see *id.* at former subds. (b), (c)), and that "a plaintiff may as a matter of right amend an existing complaint to add a cause of action arising

_____

dissent that "starts in the wrong place" (*ibid.*) by simply assuming, based solely on our prior description of a PAGA plaintiff as the state's representative, that the scope of authority PAGA confers necessarily includes that power. Notably, the dissent, although rejecting our extensive "textual" analysis (dis. opn. of Liu, J., *post*, at p. 2), conducts no examination of PAGA's language and makes no effort to ground the intervention authority Olson asserts within the statute's text or legislative history.

under [PAGA] at any time within 60 days of the time periods specified in this part" (§ 2699.3, former subd. (a)(2)(C)). These provisions, which authorize aggrieved employees to bring or commence a civil action, contain no language expressly referencing intervention.

The absence of such language, however, is not, as Turrieta and Lyft suggest, determinative. As we have explained, "whatever is necessarily implied in a statute is as much a part of it as that which is expressed." (*Johnston v. Baker* (1914) 167 Cal. 260, 264.) Relatedly, "[i]t is a well-recognized rule of statutory construction that a general grant of power, unaccompanied by specific directions as to the manner in which the power is to be exercised, implies the right and duty to adopt and employ such means and methods as may be reasonably necessary to a proper exercise of the power." (*Laurelle v. Bush* (1911) 17 Cal.App. 409, 415–416 (*Laurelle*); see *Western U. Tel. Co. v. Superior Court of Sacramento County* (1911) 15 Cal.App. 679, 692 [as to a legislative "grant of powers," "the body clothed with such powers may exercise, additionally, such implied or incidental powers as may be found necessary to enable it to execute its express powers, or, in other words, to properly and fully carry out its main purposes"].)[11]

---

[11] Consistent with our description of a PAGA plaintiff as an "agent of state labor law enforcement agencies" (*Amalgamated*, *supra*, 46 Cal.4th 993, 1003), we note the existence of similar principles under the general law of agency. "[A]n agent has only such authority as the principal either actually or ostensibly confers upon" the agent. (*Acme Gravel Co. v. Bryant* (1931) 111 Cal.App. 411, 414.) Because it is assumed " 'the principal does not wish to authorize what cannot be achieved if necessary steps are not taken by the agent, and that the principal's manifestation [of authority] often will not specify all steps

Under these principles, a PAGA plaintiff has authority to *prosecute* a PAGA action after commencing one, notwithstanding PAGA's failure to expressly reference any such power. The authority to *prosecute* a PAGA action is necessarily implied in the PAGA provisions stating that "an aggrieved employee may recover the civil penalty described in subdivision (f) [of section 2699] in a civil action" (§ 2699, former subd. (g)(1)) and that civil penalties prescribed by other statutes "may . . . be recovered through a civil action brought by an aggrieved employee" (*id.*, former subd. (a)). Absent the implied power to prosecute, the express power to commence PAGA actions for recovery of civil penalties "on behalf of the state" (*Iskanian*, *supra*, 59 Cal.4th at p. 381) would be meaningless. And because the power to commence a PAGA action necessarily implies the power to prosecute the action, it also necessarily implies the

necessary to translate it into action,' " "an agent expressly granted a specific power" has "implied authority . . . to effectuate it." (*Harrod v. Country Oaks Partners, LLC* (2024) 15 Cal.5th 939, 960–961.) But this implied authority "is no more than what the principal [itself] actually intended the agent to do under the circumstances." (*Garber v. Prudential Ins. Co. of America* (1962) 203 Cal.App.2d 693, 710.) It extends only to "those things necessarily incident to the execution of the powers specially mentioned." (*Quay v. Presidio etc. R. R. Co.* (1889) 82 Cal. 1, 4.) In other words, "an agent's actual authority consists of those acts the principal has intentionally delegated to the agent and those impliedly necessary to perform the tasks expressly delegated." (*Oswald Machine & Equipment, Inc. v. Yip* (1992) 10 Cal.App.4th 1238, 1248.) Thus, to determine the "extent of" the agent's authorized "duties," courts look to "the terms of the agreement between the parties, interpreted in light of the circumstances under which it is made." (*Chen v. PayPal, Inc.* (2021) 61 Cal.App.5th 559, 575; see *Harrod*, at p. 961 ["The nature of the task delegated in a power of attorney itself provides a limit on the powers to be implied"].)

power to use the ordinary tools of civil litigation incident to the power to prosecute, such as serving the summons and complaint, taking discovery, filing motions, attending trial, and presenting evidence. These powers are "reasonably necessary to a proper exercise of" (*Laurelle*, *supra*, 17 Cal.App. at p. 416) the powers to commence and to prosecute a PAGA action for recovery of civil penalties on the state's behalf. By facilitating "the effective prosecution of representative PAGA actions," they further "the Legislature's objectives" in authorizing such actions: " 'enforc[ing] the state's interest in penalizing and deterring employers who violate California's labor laws.' " (*Williams v. Superior Court* (2017) 3 Cal.5th 531, 548, italics omitted (*Williams*); see *id.* at p. 546 [PAGA's "purposes would be ill served by" requiring "deputized aggrieved employees [to] satisfy a PAGA-specific heightened proof standard at the threshold, before discovery" is permitted].)

What is less clear, and the question to which we now turn, is whether recognition of the intervention power Olson asserts would further the Legislature's objectives in authorizing an aggrieved employee to commence and prosecute a PAGA action. "The Legislature enacted PAGA to remedy systemic underenforcement of many worker protections." (*Williams*, *supra*, 3 Cal.5th at p. 545.) It addressed this issue "by deputizing employees harmed by labor violations to sue on behalf of the state and collect penalties, to be shared with the state and other affected employees." (*Ibid.*) "[B]y empowering employees to enforce the Labor Code as representatives of" the LWDA, the Legislature sought "to augment" the LWDA's "enforcement capability" (*Iskanian*, *supra*, 59 Cal.4th at p. 383), "to vindicate" its "interest in enforcing the Labor Code" (*id.* at pp. 388–389), and to "enforce *the state's* interest in penalizing

and deterring employers who violate California's labor laws" (*id.* at p. 387). In other words, a PAGA suit is "essentially a qui tam action filed on behalf of the state to assist it with labor law enforcement." (*Williams*, at p. 538.)

Here, Turrieta's PAGA action serves these statutory purposes. By filing and prosecuting it, Turrieta "sue[d] on behalf of the state and [sought to] collect [civil] penalties" on the state's behalf for Lyft's alleged violations of the Labor Code. (*Williams*, *supra*, 3 Cal.5th at p. 545.) In so doing, she was attempting "to vindicate the [LWDA's] interest in enforcing the Labor Code" (*Iskanian*, *supra*, 59 Cal.4th at pp. 388–389)*,* to "enforce *the state's* interest in penalizing and deterring employers who violate California's labor laws" (*id.* at p. 387), and to "assist [the state] with labor law enforcement" (*Williams*, at p. 538). She was " 'represent[ing] the same legal right and interest as state labor law enforcement agencies,' " i.e., " 'recovery of civil penalties that otherwise would have been assessed and collected by' " the LWDA. (*Iskanian*, at p. 380.) "Practically," she and her counsel stood "to gain from proving as convincingly as possible as many Labor Code violations as the evidence [would] sustain, thereby maximizing the recovery for aggrieved employees as well as any potential attorney fee award." (*Williams*, at pp. 548–549.) In this respect, her interests were "largely aligned" with those of "other potentially aggrieved employees." (*Ibid.*) In light of these considerations, it is debatable whether recognition of the intervention power Olson asserts — which he bases on his simultaneous representation of *the very same state interests* that Turrieta already represents — is reasonably necessary to effectuate the Legislature's objectives in authorizing PAGA actions. (See *id.* at p. 548.)

Not surprisingly, on this precise question, the parties starkly disagree. Olson argues that declining to recognize the power of a PAGA plaintiff to intervene in another plaintiff's PAGA action involving overlapping claims would be "antithetical to PAGA's aims" and the Legislature's "purpose." It would, he asserts, "permit[] hasty, secret settlements to be quickly approved by busy trial courts" without the benefit of the special "insight [and] perspective" that other PAGA plaintiffs have developed through litigating identical claims in their own separate actions, and it would "insulate those settlements from any appellate review." It would also "invite[] mischief by encouraging a race to the bottom" through use of a strategy known as a "reverse auction," in which "defendants facing multiple PAGA lawsuits . . . put the case out to bid" and one PAGA plaintiff, "pressure[d] to settle *all* the cases at a steep discount," agrees "to resolve the case for the *lowest* value" and is "reward[ed]" through court approval of " 'a weak settlement that will preclude other claims against the defendant.' " Lyft, Olson asserts, "employed" precisely this "strategy" in this case, "play[ing]" counsel representing the various plaintiffs in multiple PAGA actions "against each other in order to drive down the overall settlement value, to the detriment of the State."

Turrieta, by contrast, argues that allowing intervention would make PAGA claims "dramatically harder to pursue." It would enable "competing litigants" on the plaintiff's side of the action asserting "conflicting positions" — "all purportedly on behalf of the same real party in interest" — to "disrupt settlements" and "derail litigation and resolution for years." Moreover, Turrieta argues, in light of the PAGA provision on recovery of attorney's fees and costs (§ 2699, former subd. (g)(1)),

proposed intervenors like Olson and their counsel — who have been litigating separate PAGA actions — have an "economic[] incentiv[e]" to object to the original plaintiff's proposed settlement even if it "is in the best interests of the State." Under that provision, PAGA plaintiffs and counsel "receive[] no money" — i.e., no costs or attorney's fees — if they "choose[] not to object to" another PAGA plaintiff's proposed settlement. Conversely, if they do object, then they may "bargain for a share of the attorney fees [and costs] in exchange for withdrawing [their] objection." Allowing intervention, Turrieta argues, would therefore "create a [fight] over attorney fees," with intervening PAGA plaintiffs and their counsel having the power "to impose years of delay" on a PAGA plaintiff's resolution of claims "by objecting and appealing any PAGA settlement" and "leverag[ing] that power to demand a share of attorney fees from any settlement."

Given these conflicting views, and because a textual analysis is not dispositive, we examine additional considerations, including other PAGA provisions that are relevant to the parties' arguments on whether intervention on the state's behalf would further PAGA's purpose.

## B. The Broader Statutory Scheme

Other aspects of the statutory scheme suggest that recognition of the intervention power Olson asserts is neither reasonably necessary to effectuate PAGA's purpose nor consistent with the Legislature's intent. As earlier noted, insofar as the provisions of PAGA that apply here speak to the involvement in a PAGA action of anyone other than the court, the defendant, and the plaintiff filing the action, they mention only *the state*. As to cases "filed on or after July 1, 2016," the

plaintiff, "within 10 days following commencement of" a PAGA action, must "provide the [LWDA] with a file-stamped copy of the complaint." (§ 2699, former subd. (*l*)(1).) Any proposed settlement of a PAGA "civil action" must be submitted to the court for review and approval and, "at the same time," must "be submitted to the [LWDA]." (*Id.*, former subd. (*l*)(3).) A copy of the court's judgment in a PAGA action and of "any other order in that action that either provides for or denies an award of civil penalties" must "be submitted to the [LWDA] within 10 days after entry of the judgment or order." (*Id.*, former subd. (*l*)(3).) PAGA specifies precisely how these items "shall be transmitted to the [LWDA]": "online through the same system established for the filing of notices" that an aggrieved employee must file with the LWDA before commencing a civil action. (*Id.*, former subd. (*l*)(4).) The existence of detailed provisions regarding *the state's* involvement in an aggrieved employee's PAGA action, contrasted with the absence of *any* provision regarding involvement of anyone else, suggests the Legislature neither envisioned nor intended that the scope of a duly deputized PAGA plaintiff's power to prosecute claims on behalf of the state includes the power to intervene in the separate PAGA action of another plaintiff who has been duly deputized to prosecute the same claims on the state's behalf.

Indeed, as Lyft points out, the absence of any provision for involvement of, or even notice to, "other PAGA plaintiffs" is particularly notable and "conspicuous" in the settlement context given the existence of a PAGA provision requiring that any proposed settlement "be submitted *to the* [*LWDA*] at the same time that it is submitted to the court" for review and approval. (Lab. Code, § 2699, former subd. (*l*)(2), italics added.) In this respect, as Turrieta notes, PAGA expressly provides for review

of any proposed settlement "by two distinct entities: . . . the trial court and . . . the LWDA." Relying on this provision, Turrieta asserts the Legislature has "assign[ed]" the "job" of evaluating proposed settlements "to the LWDA and the court" and has established "safeguards" to "protect the state's interests" and "to prevent reverse auctions" of the kind that Olson describes. Relatedly, Turrieta rightly asks, had the Legislature contemplated or envisioned that *other* PAGA plaintiffs would or should have a formal oversight role regarding settlement through intervention and the filing of objections, "wouldn't it have provided for these litigants to at least receive notice of such settlements?"[12]

---

[12] Insofar as PAGA does not require that notice of a settlement be given to other aggrieved employees, a PAGA action is different from a class action. In class actions, "class representatives [must] notify [absent] class members of a pending settlement on the merits and provide them with the opportunity to object at the final settlement fairness hearing." (*Hernandez v. Restoration Hardware, Inc.* (2018) 4 Cal.5th 260, 266.) "These duties are necessary in the class action context to protect absent employees' due process rights" (*Williams, supra,* 3 Cal.5th at p. 547, fn. 4), because a class action resolves "the claims of many individuals" — i.e., absent class members — " 'at the same time' " (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 469; see *Estrada v. Royalty Carpet Mills Inc.* (2024) 15 Cal.5th 582, 599 [" 'A class-action plaintiff can raise a multitude of claims because he or she represents a multitude of absent individuals' "]). "[N]o similar due process concerns arise under PAGA because absent employees do not own a personal claim for PAGA civil penalties [citation], and whatever personal claims [they] might have for relief are not at stake." (*Williams,* at p. 547, fn. 4.) In other words, because a PAGA plaintiff " 'represents a single principal' " — the LWDA — and a PAGA action "do[es] not adjudicate [the] individually held claims" of absent employees, "the due process rights of third parties are not paramount." (*Estrada, supra,* 15 Cal.5th at p. 599.) In these

Notably, the Court of Appeal relied on this same PAGA provision to reject Olson's argument that declining to recognize a PAGA plaintiff's authority to intervene in a parallel PAGA action would " 'insulat[e]' " proposed PAGA settlements " 'from objection at the trial court level' " and "allow[]" a PAGA plaintiff "to 'settle PAGA claims on patently unreasonable terms.' " (*Turrieta*, *supra*, 69 Cal.App.5th at 972.) Consistent with this view and with Turrieta's arguments, we have previously explained that courts performing their statutory review function have a duty to "ensur[e] that [the] negotiated resolution [of a PAGA claim] is fair to those affected." (*Williams*, *supra*, 3 Cal.5th at p. 549; see *Moniz*, *supra*, 72 Cal.App.5th at p. 89 [trial court reviewing proposed PAGA settlement "must scrutinize whether" the plaintiff "has adequately represented the state's interests, and hence the public interest"].) Indeed, as Turrieta and Lyft note, the trial court here expressly considered, and rejected as a matter of fact, a reverse-auction argument.

Olson insists that settlement oversight by only the courts and the LWDA is insufficient. He first suggests that courts, unless provided with "independent perspectives" and "important information" from intervening PAGA plaintiffs, are not adequately equipped to " 'sniff out bad deals' " and "assess[] [the] fairness" of a proposed settlement. He next argues that the LWDA, due to insufficient "resources" and "personnel," lacks "the capacity to review" proposed settlements and provide courts with the necessary input. "[B]y definition," Olson asserts, the LWDA is "too overburdened to weigh in upon the hundreds of PAGA settlements presented to it each year." Because the

respects, the interests of a nonparty PAGA plaintiff differ from those of absent class members.

"beleaguered" LWDA "simply does not have the capacity to quickly respond to settlements brokered in secret and then hastily pushed through the approval process," relying on settlement review by the LWDA — in lieu of review by "its proxy," i.e., a PAGA plaintiff in a separate, parallel action who intervenes — is "impractical."

The Division of Labor Standards Enforcement (DLSE), participating as amicus curiae, likewise asserts that the LWDA's "resources are inadequate to fully review the large volume of PAGA cases filed" and to "identify every deficient settlement, let alone litigate challenges to these settlements." For this reason, the DLSE states, the LWDA "relies on non-settling PAGA plaintiffs to bring PAGA settlement defects to its attention and to the courts, and to otherwise protect its interests from inadequate or overbroad settlements." The DLSE further asserts that allowing intervention by PAGA plaintiffs who are litigating identical claims in their own separate actions is beneficial because they are "often in a better position than the LWDA to inform [courts] of matters that could weigh against settlement approval" and thus "are uniquely positioned to further PAGA's goal of labor law enforcement by ensuring settlements are fair to the LWDA and California's worker."[13]

---

[13]    Shortly before oral argument in this case, Turrieta requested judicial notice of two reports on PAGA issued by the UCLA Labor Center. The first, dated February 2020, is entitled, "California's Hero Labor Law: The Private Attorneys General Act Fights Wage Theft and Recovers Millions from Lawbreaking Corporations." The second, dated February 2024, is entitled, "A Shrinking Tool Box: The Corporate Efforts to Eliminate PAGA and Limit California Worker's Rights." Turrieta argues these reports are "relevant" to the assertion of Olson and the DLSE that the LWDA lacks sufficient resources to review PAGA

We find these arguments unpersuasive in light of several considerations suggesting that the Legislature contemplated formal oversight and review of proposed settlements only by the LWDA and trial courts. First, the Legislature, in passing PAGA, emphasized that under its provisions, "state labor law enforcement agencies' enforcement actions have primacy over any private enforcement efforts undertaken pursuant to" PAGA. (Stats. 2003, ch. 906, § 1, subd. (d).) Second, although it is true the Legislature enacted PAGA in 2003 in part because of a then-perceived "shortage of government resources" (*Iskanian*, *supra*, 59 Cal.4th 348 at p. 379), it also true the Legislature expected and intended that PAGA actions by aggrieved employees would provide additional revenue to the state in general and to the

---

settlements, because they "provide[] data obtained through [] Public Records Act request[s] showing that the annual revenue received by the LWDA from PAGA payments has increased over time, reaching more than $88 million in 2019" and "more than $200 million in 2022."

Olson asserts in opposition to Turrieta's request that the data analyses, opinions, and conclusions contained in these reports are "reasonably subject to dispute" and that the inference Turrieta asks us to draw from them — "the LWDA has unlimited resources to review PAGA settlements" — "is false" as shown by the following: (1) the assertions in the DLSE's amicus brief regarding the inadequacy of the LWDA's resources and the volume of PAGA cases filed; and (2) documents related to the state budget showing that "funds from PAGA settlements and judgments payable to the LWDA have . . . been 'loaned' to the state's General Fund." Olson, although citing and quoting the budget-related documents and providing internet links to electronically access them, does not ask for judicial notice of them.

For the reasons stated in Olson's opposition, we deny Turrieta's request for judicial notice of the two PAGA reports issued by the UCLA Labor Center.

LWDA in particular. (Sen. Com. on Judiciary, Analysis of Senate Bill No. 796 (2003– 2004 Reg. Sess.), as amended Apr. 22, 2003, p. 4 [this bill would " 'enhance our state's revenues' by allowing workers to crack down on labor violators' "]; *id.* at p. 6 [civil penalties recovered are "dedicated in part to public use (to the General Fund and the LWDA) instead of being awarded entirely to the plaintiff"]; Assem. Com. on Judiciary, Analysis of Senate Bill No. 796 (2003–2004 Reg. Sess.), as amended May 12, 2003, p. 4 [PAGA will "generate revenues to the state at a time when we need them"].)

The third consideration that cuts against Olson's argument is the evolution of PAGA's settlement oversight provisions. The initial version of PAGA contained no provision regarding settlement. (Stats. 2003, ch. 906, § 2, pp. 6629–6631.) The Legislature first addressed this subject in 2004, adding a provision — section 2699, former subdivision (*l*) — specifying that "[t]he superior court shall review and approve any penalties sought as part of a proposed settlement agreement pursuant to" PAGA. (Stats. 2004, ch. 221, § 3, p. 2419.) According to the relevant legislative history, "[t]he purpose of" this change was "to ensure that settlements involving penalties" under PAGA "do not undercut the dual statutory purposes of punishment and deterrence, or result in unjust, arbitrary and oppressive, or confiscatory settlements." (3 Sen. J. (2003–2004 Reg. Sess.) pp. 4754–4755.)

In 2016, the Legislature amended former subdivision (*l*) of section 2699 to require judicial review and approval of "*any* [PAGA] *settlement*" (§ 2699, subd. (*l*)(2), italics added; see Stats. 2016, ch. 31, § 189), not just "penalties sought" in a settlement (Stats. 2004, ch. 221, § 3, p. 2419). The legislative history accompanying this amendment reveals that this expansion of

the court's role was thought necessary because under the 2003 statute, "court approval [was] not required if the parties decide[d] to waive penalties." (Dept. Industrial Relations, Enrolled Bill Rep. on Sen. Bill No. 836 (2015–2016 Reg. Sess.), June 16, 2016, p. 3.) Thus, "[n]o PAGA penalties mean[t] no need for court approval . . . and no way for the state to know whether or how the interests of both the public and the employees who were represented in the action were served." (*Id.* at p. 2.) This was happening in most PAGA actions because PAGA plaintiffs typically also asserted "substantive wage or other employment rights claims" and were "more focused on resolving those claims than [on] recovering PAGA penalties for the state." (Dept. Industrial Relations, Enrolled Bill Rep., *supra*, at p. 3.) Extending the "court approval" requirement to "all [PAGA] settlements" would "make it far more difficult for parties to settle . . . simply by agreeing to dismiss PAGA claims or by focusing exclusively on the interests of the plaintiffs' counsel, named plaintiffs, and defendant, to the exclusion of other employees and former employees whose interests purportedly are being represented." (*Id.* at p. 6.) The broader approval requirement thus would "afford . . . protection to employees and the state whose interests are being represented by PAGA litigants." (*Id.* at p. 4.)

When the Legislature expanded judicial settlement oversight in 2016, it also added provisions to facilitate and increase the LWDA's involvement in PAGA litigation, including the settlement process. Most relevant to our analysis, it required that any "proposed settlement" be submitted to the LWDA "at the same time . . . it is submitted to the court" for review and approval. (§ 2699, former subd. (*l*)(2).) It also increased the amount of time the LWDA has to initially review

PAGA notices and to investigate and issue citations in cases it accepts before PAGA actions may be filed (§§ 2699.3, former subd. (a)(2)(A)–(B)), and it required that the LWDA be provided with "a file-stamped copy of the complaint" within 10 days of the action's commencement (§ 2699, former sub. (*l*)(1)) and with copies of the judgment and any other order providing for or denying an award of civil penalties (*id.*, former subd. (*l*)(3)). (See Stats. 2016, ch. 31, § 189.)

According to relevant legislative history, the purpose of these changes was "to improve the review and oversight of PAGA cases by" the LWDA. (Dept. Finance, Enrolled Bill Rep. on Sen. Bill No. 836 (2015–2016 Reg. Sess.), June 16, 2016, p. 7.) Because of an unanticipated "explosion in [PAGA] claims and the same lack of [agency] resources" that initially led to PAGA's enactment (Dept. Industrial Relations, Enrolled Bill Rep., *supra*, at p. 2), the LWDA "lacked the capacity . . . to oversee PAGA cases in any meaningful way" (*id.* at p. 4). It was unable to "conduct[] a meaningful [initial] review in more than a handful of the 6,000 or more notice claims submitted annually." (*Id.* at p. 2.) And it had "no way of knowing what happen[ed]" in cases it had "not taken over, unless and until [it] receive[d] a check for its share of the PAGA penalties." (*Ibid.*) This after-the-fact receipt of penalty payments, which "appear[ed] to occur in only about 10–15% of the cases" (*ibid.*), did not enable the LWDA "to determine or verify whether penalty recoveries [were] appropriate in the context of an individual case or in the broader context of the volume of PAGA litigation being conducted" (*id.* at p. 4). Extending the time for LWDA review and investigation and requiring that PAGA complaints, proposed settlements, and judgments be submitted to the LWDA would give the agency "the ability to track PAGA

litigation through to conclusion" (Dept. Industrial Relations, Enrolled Bill Rep., *supra*, at p. 4), "to better evaluate what happens with these cases" and, "in turn," "to better assess PAGA's fairness and effectiveness as an enforcement tool" (*id.* at p. 6). These changes, along with expanded judicial review of settlements, would "ensure that PAGA cases [were] pursued in the public's interest and not just for private purposes." (*Id.* at pp. 1–2.) They were expected and intended "to create meaningful oversight mechanisms" that would "improve oversight of PAGA cases, consistent with the law's original intent, to improve outcomes for workers and the state." (*Id.* at pp. 4, 6.)

The Legislature simultaneously provided the LWDA with additional funds to perform its oversight responsibilities. It established filing fees for both employees submitting notices and "any employer response to [those] notice[s]" (§ 2699.3, former subd. (a)(1)(B)), and it directed that those fees — estimated to provide "$500,000 in annual revenue" (Dept. Industrial Relations, Enrolled Bill Rep., *supra*, at p. 5) — "be paid into the Labor and Workforce Development Fund and used for the purposes specified in [former] subdivision (j) of Section 2699" (§ 2699.3, former subd. (a)(1)(C)), i.e., "enforcement of labor laws, including the administration of [PAGA], and for education of employers and employees about their rights and responsibilities under this code" (§ 2699, former subd. (j)). On top of these filing fees, the Legislature, in the "newly-adopted state budget," provided the LWDA with "$1.6 million in initial funding" — with an anticipated $1.5 million annually thereafter — to "establish[] a small PAGA Unit within [the] LWDA" and to hire "the staff needed to perform [the] LWDA's

oversight functions." (Dept. Industrial Relations, Enrolled Bill Rep., *supra,* at pp. 2, 4, 5.)

This legislative history, viewed collectively, undermines Olson's assertion that because joint oversight by courts and the LWDA is inadequate, the power to intervene in Turrieta's action must be within the scope of his power to commence and prosecute a PAGA action on the state's behalf. As detailed above, when the Legislature expressly addressed oversight, it looked *only* to the courts and to the LWDA, and it provided the funds it deemed necessary for the LWDA to effectively perform its statutorily assigned oversight functions. These actions of the Legislature and the explanatory comments in the legislative history — which contain no mention or suggestion of oversight by anyone else — indicate the Legislature does not share Olson's view that courts are not adequately equipped to " 'sniff out bad deals' " and "assess[] [the] fairness" of proposed settlements, that the LWDA's financial "resources are inadequate to fully" perform its oversight functions, and that joint oversight by courts and the LWDA is insufficient to fulfill the Legislature's purposes in enacting PAGA.

Moreover, in light of this legislative background, we find it especially noteworthy that neither Olson nor the DLSE point to any *evidence* — in the record or otherwise — to support their assertion that the financial resources of the LWDA, notwithstanding its budget allocation and the fees and civil penalties it receives through PAGA litigation, are insufficient to perform its oversight functions. "[I]t is axiomatic that statements made in briefs are not evidence" (*People v. Edwards* (2023) 88 Cal.App.5th 1259, 1269) and that reviewing courts "do not consider" unsupported "factual assertions" in appellate briefs "that find no basis in the record." (*Associated Builders*

*and Contractors, Inc. v. San Francisco Airports Com.* (1999) 21
Cal.4th 352, 376, fn. 5.) Given these principles and the
legislative history, the argument of Olson and the DLSE that
the LWDA lacks sufficient resources to do its statutory job is
ultimately a matter for the Legislature to consider, not a basis
for concluding that the intervention power Olson asserts is
reasonably necessary to accomplish PAGA's purpose and thus
encompassed within the scope of his statutory authority to
commence and prosecute an action on the state's behalf.[14]

The 2016 legislative history also reflects another legislative
concern that is relevant to Olson's arguments in support of
intervention: the difficulty of "pursu[ing] PAGA litigation."

---

[14] The dissent's confidence in how "well positioned" the
DLSE is "to assess the LWDA's capacities" (dis. opn. of Liu, J.,
*post*, at p. 18) does not persuade us to ignore established
appellate principles regarding factually unsupported assertions
in briefs, or " 'the general rule that an appellate court generally
is not the forum in which to develop an additional factual
record.' " (*People v. Castillo* (2010) 49 Cal.4th 145, 157; cf.
*Mangini v. R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057,
1063 [" 'taking of judicial notice of the official acts of a
governmental entity does not in and of itself require acceptance
of the truth of factual matters which might be deduced
therefrom' "].) Nor are we persuaded to abandon these
principles by the two decisions the dissent cites; neither
involved the type of *factual* assertions at issue here. (*Kilby v.
CVS Pharmacy, Inc.* (2016) 63 Cal.4th 1, 15–16, 20; *Huerta v.
CSI Electrical Contractors* (2024) 15 Cal.5th 908, 935–936.)
Instead, consistent with those principles, we conclude that
evaluation of the DLSE's assertion is best left to the Legislature,
which not only is "equipped for fact-finding" (*People v. Nash*
(1959) 52 Cal.2d 36, 49), but is *constitutionally* charged, along
with the Governor, with "responsibility for the state's finances
and its budgeting process" (*Professional Engineers in California
Government v. Schwarzenegger* (2010) 50 Cal.4th 989, 1010).

(Dept. Industrial Relations, Enrolled Bill Rep., *supra*, at p. 2.) There was discussion of this subject during earlier attempts — in 2006 and 2010 — to amend PAGA to require that a "notice of the request for court [settlement] approval" be served on the LWDA well before the filing of the approval request in court. (Sen. Bill No. 989 (2009–2010 Reg. Sess.), as amended Mar. 23, 2010, § 1; see also Assem. Bill No. 2997 (2005–2006 Reg. Sess.), as introduced Feb. 24, 2006, § 1 ["The parties seeking court approval of a settlement . . . shall serve the [LWDA] notice of the request for court approval"].) In 2006, opponents of the proposed amendment argued it would make the settlement process "more difficult and costly by allowing the eleventh-hour involvement of an agency whose prior lack of participation in the case means it will have no appreciation for what each side compromised on, and why." (Assem. Com. on Labor and Employment, Analysis of Assem. Bill No. 2997 (2005–2006 Reg. Sess.), as introduced Feb. 24, 2006, p. 4.) Opponents voiced similar concerns in 2010, arguing that the amendment "would weaken the PAGA," would be "counterproductive to the settlement process," and would "discourage legitimate PAGA actions" by allowing "interfere[nce] with" settlements "to which the plaintiff and defendant have agreed," "increas[ing] the hurdles plaintiffs must jump through in order to process a viable claim," "unreasonably slow[ing] the process," and "increas[ing] the likelihood of prolonged litigation." (Senate Com. on Labor and Industrial Relations, Analysis of Sen. Bill No. 989 (2009–2010 Reg. Sess.), as amended Apr. 15, 2010, p. 4.) Opponents of the 2016 legislation similarly argued that the proposed amendments would "erect[] procedural barriers that [would] impede or discourage advocates from using PAGA to enforce worker rights." (Dept. Industrial Relations, Enrolled Bill Rep.,

*supra*, at p. 6.) Proponents of the legislation countered that the extension of time "between the filing a PAGA notice and the right to commence litigation" was "minimal" (*id.* at p. 6); that the other "modest changes to the PAGA" (*id.* at p. 2) would "add a few additional procedural hurdles that potentially could become litigation issues if not strictly or substantially adhered to" (*id.* at p. 6); and that the "intent" was to provide for "improved public oversight of PAGA cases," not "to curtail or make it harder to pursue PAGA litigation" (*id.* at p. 2).

Olson's proposed reading of PAGA — which would permit multiple PAGA plaintiffs, all representing the same state interest, to formally intervene in and become parties to the PAGA action of another PAGA plaintiff who is already representing that state interest — clearly implicates concerns about curtailing PAGA litigation by making it more difficult. As Turrieta points out, such intervention would "create[] a situation where" a single "real party in interest" — the state — is represented in a single action by multiple proxies or agents with multiple "sets of lawyers," all "purporting to advocate for the same client" and pursuing the state's single claim for civil penalties based on the same Labor Code violations. As Olson rightly acknowledges, the various "proxies may, at some point, have differing views on how to proceed." Where such differing views exist, several questions would arise: Which plaintiff controls and directs the litigation and the settlement process? Do all plaintiffs have equal authority? May any one of them unilaterally settle the claims on the state's behalf without agreement of, or in the face of affirmative opposition from, other proxies? If there is a successful resolution of the state's claim, may all of them recover attorney's fees and costs under the provision of PAGA that states, "Any employee

who prevails in any action shall be entitled to an award of reasonable attorney's fees and costs"? (§ 2699, subd. (g)(1).) Notably, the court would have faced precisely these questions had it granted Olson's intervention motion and allowed him to file his proposed complaint in intervention, which, as earlier noted, requested "[d]esignation of [Olson's] counsel of record as Lead Counsel for the Aggrieved Employees," "[c]osts of suit," "[a]ppropriate service payments to Plaintiff for his service as a PAGA representative[]," and "[a]ttorneys' fees, pursuant to PAGA, Code of Civil Procedure § 1021.5, and all other bases for fees in the Labor Code."

PAGA, which does not reference intervention in a PAGA action by another aggrieved employee who is pursuing identical claims in a separate PAGA action, offers no guidance on these questions. PAGA's legislative history is similarly silent — and thus similarly unilluminating — regarding intervention of the sort that Olson proposes.

Nor do other statutes or judicial decisions offer any specific or clear guidance regarding the questions that would arise were we to find that the scope of a PAGA plaintiff's authority includes the intervention power that Olson posits. Section 387 itself does not speak to any of these issues, and Olson cites to no other potentially applicable provision. As for case law, some decisions indicate that an intervenor "is to be regarded as a plaintiff" (*Boskowitz v. Thompson* (1904) 144 Cal. 724, 729) who "stand[s] on equal footing with the original parties" (*Carlsbad Police Officers Association v. City of Carlsbad* (2020) 49 Cal.App.5th 135, 154) and is "vested 'with all of the same procedural rights and remedies of the original parties' [citation], including the right to seek attorneys' fees under [Code of Civil Procedure] section 1021.5 in a public interest lawsuit on equal terms with

the original parties" (*City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 87). Other decisions indicate that an intervenor is, "generally speaking," "bound by the record of the action at the time of intervention" (*McNeil v. Morgan* (1910) 157 Cal. 373. 377), "may be required to assume a somewhat secondary role in the litigation" (*Catello v. I.T.T. General Controls* (1984) 152 Cal.App.3d 1009, 1015, fn. 8), and may be subject to "reasonable limits even" where intervention is granted as a matter "of right" (*Carlsbad*, *supra*, 49 Cal.App.5th at p. 141). Such limits are necessary and appropriate, courts have reasoned, because "where there are several counsel some one must be the absolute master of the litigation," and it is the original " 'plaintiff who has made himself liable to his counsel for legal services and has had to carry the brunt of all the expenses involved in preparing the case for filing and for trial.' " (*Bosch v. Standard Oil Co. of Cal.* (1961) 193 Cal.App.2d 426, 430.) For this reason, "[c]ounsel for interveners" are not "entitled to any fee out of any recovery" in the action absent an "affirmative[] show[ing] that their contribution is separate, distinct and of a character which was not, could not or would not have been made by counsel for the original plaintiff." (*Mann v. Superior Court of Los Angeles County* (1942) 53 Cal.App.2d 272, 281.) These divergent decisions raise complex and unsettled questions regarding an intervenor's role and authority vis-à-vis the original plaintiff, questions that PAGA does not answer. As Turrieta asserts, the absence of any provision instructing courts how "to manage multiple intervenors" would make PAGA claims "dramatically harder to pursue" were intervention allowed.

The dissent's primary response on this issue actually helps to make our point. Citing "[o]ther qui tam statutes [that] contemplate the intervention of multiple representatives of the

state in a single suit," the dissent states that "our trial courts" have faced — and therefore are "equipped" to deal with — "such complexity arising from multiparty litigation." (Dis. opn. of Liu, J., *post*, at pp. 14–15.) But in matters involving the statutes the dissent cites, courts will not face the type of complex intervention question presented here: may *multiple private* plaintiffs who have filed separate actions asserting identical claims, all representing the same state interest, intervene in the action of another *private* plaintiff. The qui tam statutes the dissent cites, by their terms, *preclude* this scenario, by providing that once a private person files an action, no other private person may do so based on the same underlying facts. (Gov. Code, § 12652, subd. (c)(10) ["When a person brings an action under this subdivision, no other person may bring a related action based on the facts underlying the pending action"]; Ins. Code, § 1871.7, subd. (e)(5) ["When a person . . . brings an action under this section, no person other than the district attorney or [insurance] commissioner may . . . bring a related action based on the facts underlying the pending action unless that action is authorized by another statute or common law"].) In actions under these other qui tam statutes, the only other potential litigants will be *government* officials. (Gov. Code, § 12652, subds. (a)(1) [authorizing "the Attorney General" to "bring a civil action"], (b)(1) [authorizing the "prosecuting authority of [the affected] political subdivision" to "bring a civil action"]; Ins. Code, § 1871.7, subd. (d) [authorizing "The district attorney or [insurance] commissioner" to "bring a civil action"].)

Perhaps more importantly, unlike PAGA, which is silent as to intervention, the qui tam statutes the dissent cites contain extensive and detailed provisions expressly addressing this subject. These provisions specify, among other things, who may

intervene, when intervention is allowed, who controls the action after intervention, the limits a court may impose on the private qui tam plaintiff in the event of intervention by a government official, the allocation of proceeds, and the recovery of costs, expenses and attorney's fees in a successful action in which there has been intervention. (Gov. Code, § 12652, subds.(a)(3), (b)(3), (c)(4) (c)(6), (c)(7)(B), (c)(7)(D)(i), (c)(8)(A), (c)(8)(D), (e)(1), (e)(2), (f)(2)(a), (f)(2)(B), (g); Ins. Code, § 1871.7, subds. (e)(2), (e)(4), (f)(1), (f)(2)(A)(B), (g).)  As explained, the Legislature's failure to address any of these topics or include any such provisions in PAGA is a factor that supports the conclusion that the scope of Olson's statutory authority under PAGA does not include the power to assert any state right to intervene in Turrieta's action.[15]

---

[15]   In its discussion, the dissent also cites to *Accurso v. In-N-Out Burgers* (2023) 94 Cal.App.5th 1128, review granted, Nov. 29, 2023, S282173 (*Accurso*).  (Dis. opn. of Liu, J., *post*, at p. 15.) As the dissent elsewhere notes, the *Accurso* court stated that " 'ordinary rules of civil procedure, supplemented where necessary and appropriate by rules governing coordination of complex cases, are adequate to the task of resolving the difficult procedural problems that arise when multiple LWDA-deputized PAGA claimants sue the same target employer in different courts.' "  (Dis. opn. of Liu, J., *post*, at p. 6.)  But the *Accurso* court did not make this statement in the context of discussing how courts can deal with the problems associated with allowing, through intervention, multiple plaintiffs and their counsel to simultaneously litigate identical PAGA claims *in a single court*, all representing the same state interest.  Indeed, the *Accurso* court did not address that subject at all.  Instead, it made the quoted statement in considering a completely different issue: whether PAGA conferred on the proposed intervenors, as the first to file a PAGA action asserting the claims in question, "the *exclusive* right to litigate [those] claims."  (*Accurso*, *supra*, 94 Cal.App.5th at p. 1147, review granted.)

The dissent alternatively argues that "making PAGA litigation more difficult" by allowing plaintiffs in overlapping actions to intervene and "*disrupt*[] *settlements*" is "entirely consistent with" the Legislature's "intent." (Dis. opn. of Liu, J., *post*, at pp. 16–17.) For this proposition, the dissent relies on the Legislature's expansion of the judicial approval requirement to all proposed PAGA settlements in order to " 'make it *far more difficult* for parties to settle' " based " 'exclusively on' " their own interests and " 'to the exclusion of' " others " 'whose interests' " the plaintiff " 'purportedly' " represents. (Dis. opn. of Liu, J., *post*, at p. 17.) From this, the dissent reasons, it follows that the Legislature would happily sacrifice the "expedien[t]" resolution of PAGA claims for "appropriately valued agreements." (*Ibid.*)

For several reasons, we are unpersuaded by the dissent's analysis of the Legislature's intent. First, insofar as intervening plaintiffs and their counsel seek to take over and control another plaintiff's PAGA action — which, as earlier noted, is what Olson requested here in his proposed complaint in intervention — their participation would create delay and complexity of an entirely different order than would the statutory judicial approval requirement. Second, the dissent's analysis ignores the financial interest that intervening plaintiffs and their counsel — but not courts — have in the original plaintiff's action and its settlement. In light of this financial interest, we do not share the dissent's view that the Legislature's decision to require approval of all PAGA settlements by *neutral* judges indicates or in any way suggests a legislative "goal of" allowing financially interested PAGA plaintiffs in overlapping actions — represented by financially interested counsel — to "*disrupt*[] *settlements*" through intervention on behalf of the state. (Dis. opn. of Liu, J., *post*, at p. 17.)

Relatedly, we are unwilling to assume, as does the dissent, that such intervention would necessarily further the goal of producing "appropriately valued [settlement] agreements." (Dis. opn. of Liu, J., *post*, at p. 17.) In making this assumption, the dissent adopts Olson's policy arguments wholesale while barely acknowledging the competing policy arguments of Turrieta and Lyft. (See *id.* at pp. 2–3 [allowing intervention furthers PAGA's "purpose" by enabling intervenors to "help ensure that proposed settlements are fair," eliminating "settlement incentives that drive a race to the bottom," and avoiding the "substantial risk of" reverse "auctioning"].) In this regard, the dissent appears to overlook the fact that *Accurso* — a decision on which the dissent heavily relies (dis. opn. of Liu, J., *post*, at pp. 6–8) — featured a fee dispute among competing PAGA plaintiffs and their attorneys along the lines that Turrieta discusses. In that case, after counsel for plaintiff Accurso began settlement negotiations with the defendant, counsel for *five* plaintiffs who had each filed a separate overlapping PAGA action "attempted to negotiate a collaborative arrangement with . . . Accurso's counsel to settle all pending PAGA claims with" the defendant "on a global basis." (*Accurso*, *supra*, 94 Cal.App.5th at p. 1134, review granted.) "[T]he negotiations foundered when no agreement could be reached on the proportionate sharing of attorney's fees recovery." (*Ibid.*) When a settlement involving only Accurso and the defendant thereafter appeared "imminent," two of the plaintiffs in the overlapping PAGA actions "moved to intervene in *Accurso*" and "requested a stay of proceedings," asserting that they had "exclusive" right to litigate the overlapping claims because they were the first to file a PAGA action asserting those claims. (*Id.* at p. 1135, review granted.) Thus, *Accurso* appears

to be a real world example of one of the concerns Turrieta has raised: that counsel for plaintiffs in overlapping PAGA actions, concerned about their fee recovery, may attempt to use intervention to derail settlement.[16]

The dissent summarily dismisses this concern based on *Hernandez v. Restoration Hardware, Inc.* (2018) 4 Cal.5th 260, but that decision did not, as the dissent asserts, discuss "formal intervention motions" as a tool "for trial courts to screen out opportunistic private plaintiffs who object to settlements only to obtain a share of attorneys' fees." (Dis. opn. of Liu, J., *post*, at p. 9.) *Hernandez* recognized in the class action context a concern that Turrieta raises here: the threat presented by " 'professional objectors' " who "harm the [very] class members whose interests they claim to protect" by filing "groundless" and "[m]eritless objections" that " 'disrupt settlements,' " "requir[e] class counsel to expend resources,' " and " 'delay the provision of relief to class members who . . . have already waited years for resolution.' " (*Hernandez*, at p. 272.) *Hernandez* cited this threat as a "policy" reason for retaining the California rule that class members may not appeal from a class settlement unless they become a named party through formal intervention *or* by filing a motion to set aside and vacate the class judgment. (*Ibid.*) Earlier in the opinion, in the passage the dissent cites, *Hernandez* stated that requiring intervention "promotes judicial economy by providing

---

[16] Contrary to what the dissent suggests, in considering the procedural problems intervention would create to determine the *threshold* question of whether Olson may assert any state right to intervene, we express no view on whether those problems may be a basis for refusing to allow intervention by someone who otherwise " 'meets the requirements for mandatory intervention.' " (Dis. opn. of Liu, J., *post*, at p. 14.)

clear notice of a *timely* intent to challenge the class representative's settlement action." (*Hernandez*, at p. 272, italics added.) Abandoning that requirement, *Hernandez* reasoned, would allow *untimely* challenges by class members who make "a strategic choice to wait and see if [they] agree[] with the settlement amount and attorney fees agreement," and then challenge the settlement "[b]y filing an appeal." (*Ibid*.) *Hernandez* did not address the effectiveness of the intervention process in other respects, and did not, as the dissent asserts, indicate that requiring intervention "helps to head off '[m]eritless objections' that disrupt settlements." (Dis. opn. of Liu, J., post, at p. 9.) Indeed, *Hernandez* also reaffirmed the rule that class members, even if they do *not* formally intervene before entry of a judgment upon a settlement, may still obtain standing to appeal simply by filing a motion to set aside and vacate the class judgment. (*Hernandez*, at p. 273 [class members filing an unsuccessful "motion to vacate the judgment" may "challenge the attorney fees award (or settlement or judgment) on appeal"].) The dissent would enable professional objectors to use *both* "procedural tools" — "intervention and vacatur" — to gain the formal right to contest PAGA settlements in *both* the trial court *and again on appeal*. (Dis. opn. of Liu, J., *post*, at p. 19.)

We also disagree with the dissent's alternative explanation for the Legislature's silence on the procedural problems arising from intervention and the Legislature's failure to recognize or even suggest an oversight role for PAGA plaintiffs in overlapping actions.[17] According to the dissent, "the better

---

[17] The dissent agrees that PAGA's text and legislative history nowhere "mention intervention by PAGA plaintiffs as a means of settlement oversight" and "support the inference that the Legislature assigned . . . the responsibility for reviewing

inference" to be drawn from these facts "is that the Legislature sought to strengthen the LWDA's oversight role even with the availability of intervention by private plaintiffs." (Dis. opn. of Liu, J., post, at p. 13.) This inference, the dissent argues, arises from the Legislature's awareness, when it enacted PAGA's oversight provisions, of " ' "existing laws" ' " — i.e., the intervention statute, section 387 — and " ' "judicial constructions" ' " of that statute. (Dis. opn. of Liu, J., *post*, at p. 13.) But the dissent points to nothing in section 387 providing awareness — either now or when the Legislature enacted oversight provisions — that a private plaintiff authorized by statute to commence an action as the state's representative may, "assert[ing] [only] the *state's interest*" (dis. opn. of Liu, J., *post*, at p. 6), intervene in the separate action of another private plaintiff who is authorized to represent *the same state interest* and who is pursuing identical claims as the state's representative. Nor does the dissent identify any " ' "judicial construction[]" ' " of section 387 that would have provided such awareness.[18] (Dis. opn. of Liu, J., *post*, at p. 13.)

---

settlements" *to the LWDA and courts*. (Dis. opn. of Liu, J., post, at p. 13.)

[18] Relatedly, the dissent asserts that we "overread[] the significance of the fact that [PAGA] speaks only of notice to the state," noting that "the LWDA provides a form of general notice to other PAGA plaintiffs through its searchable database of pending PAGA actions." (Dis. opn. of Liu, J., *post*, at p. 12.) However, the dissent offers no evidence that this database existed in 2016 when the Legislature enacted the notice provision. Nor does the dissent cite to anything suggesting that the Legislature, in addressing the oversight roles of courts and the LWDA with respect to a given PAGA action, contemplated or even considered the ability or practice of the LWDA to provide

In light of the above, we conclude that the intervention power Olson claims — which he bases on an alleged right as a state proxy to assert the state's right to intervene — is inconsistent with the scheme the Legislature enacted and, for that reason, outside the scope of his authority to commence and prosecute a PAGA action on the state's behalf.[19] Thus, he cannot establish a cognizable interest to support intervention under Code of Civil Procedure section 387 based on his asserted authority, as the state's proxy or agent, to assert any state right to intervene.[20] In reaching this conclusion, we do not take sides in the parties' policy debate over the potential benefits, disadvantages, and dangers of allowing or disallowing such intervention. We do, however, find that the arguments of Turrieta and Lyft raise substantial and important questions

---

any form of notice to PAGA plaintiffs pursuing identical claims in *separate* PAGA actions.

[19] Relatedly, we note that Olson, while asserting that "the Legislature intended for the type of checks and balances that multiple deputies" — i.e., other state agents — "would provide in the settlement process," points to nothing in the general law of agency authorizing one agent to serve as a "check[] and balance[]" as to another. Nor have we found anything recognizing such authority. "[A]ccording to the law of agency, an agent acts under the control of its *principal*." (*Raines v. U.S. Healthworks Medical Group* (2023) 15 Cal.5th 268, 289, italics added; see *Hoffmann v. Young* (2022) 13 Cal.5th 1257, 1274 [" 'Agency exists when a principal engages an agent to act on the principal's behalf and subject to its control' "]; *F. Hoffman-La Roche, Ltd. v. Superior Court* (2005) 130 Cal.App.4th 782, 797 ["the hallmark of agency is the exercise of control over the agent by the principal"].)

[20] In their discussion of intervention, Turrieta and Lyft additionally assert that Olson fails to meet a number of section 387's requirements. Given our conclusion, we decline to address those additional arguments.

regarding Olson's assertion that, as a matter of legislative intent, we should find that the scope of his statutory authority under PAGA includes the right to seek intervention on behalf of the state in Turrieta's action, and that declining to do so would be "antithetical to PAGA's aims" and "the legislative purpose." Of course, the Legislature, in its policymaking role, remains free to consider Olson's arguments — including his claim that the funds the Legislature has allocated for LWDA oversight are insufficient — and to amend PAGA and the state budget in accordance with its conclusions.[21]

This conclusion does not, as the dissent asserts, conflict with "basic" civil procedure "principles" that "facilitate . . . adjudication of the same claims in a single proceeding" (dis. opn. of Liu, J., *post*, at p. 1) or "preclude deputized PAGA plaintiffs from assisting the LWDA with [its settlement oversight] function through generally available procedural devices" (*id.* at p. 13). Code of Civil Procedure section 404.1 provides for "[c]oordination of civil actions sharing a common question of fact or law . . . if one judge hearing all of the actions for all purposes

---

[21]     We do not, as the dissent asserts, hold that PAGA "bars" intervention by Olson. (Dis. opn. of Liu, J., *post*, at p. 11.) Rather, we hold that the intervention power Olson asserts is not within the scope of the authority PAGA confers on him to act on the state's behalf. Nor, contrary to the dissent's assertion, do we "infer[] from the legislative history" that "the Legislature *intended to preclude* other PAGA plaintiffs from intervening to ensure reasonable settlements." (Dis. opn. of Liu, J., *post*, at p. 12, italics added.) Rather, we find no evidence in the legislative history that the Legislature either intended to confer on PAGA plaintiffs the intervention power Olson asserts or understood that PAGA confers such power.

in a selected site or sites will promote the ends of justice."[22] Code of Civil Procedure section 1048, subdivision (a) provides for consolidation of "all" actions "involving a common question of law or fact . . . pending before [a] court." Courts have used both tools with respect to overlapping PAGA actions. (*State ex rel. Cisneros v. Alco Harvest, Inc.* ((2023) 97 Cal.App.5th 456, 458 & fn. 2 [consolidation]; *Leenay v. Superior Court* (2022) 81 Cal.App.5th 553, 559 [coordination].) Nothing in our opinion prevents plaintiffs in overlapping PAGA actions from seeking consolidation or coordination pursuant to these statutes in order to "facilitate . . . adjudication of the same [PAGA] claims in a single proceeding." (Dis. opn. of Liu, J., *post*, at p. 1.)[23]

Nor does our opinion foreclose other ways in which "deputized PAGA plaintiffs [may] assist[]" both courts and "the LWDA with [their settlement oversight] function." (Dis. opn. of Liu, J., *post*, at p. 13.) Courts, in evaluating the adequacy and fairness of proposed PAGA settlements, remain free to exercise

---

[22] The factors to be "tak[en] into account" in determining whether coordination will serve the ends of justice are "whether the common question of fact or law is predominating and significant to the litigation; the convenience of parties, witnesses, and counsel; the relative development of the actions and the work product of counsel; the efficient utilization of judicial facilities and manpower; the calendar of the courts; the disadvantages of duplicative and inconsistent rulings, orders, or judgments; and, the likelihood of settlement of the actions without further litigation should coordination be denied." (Code Civ. Proc., § 404.1.)

[23] As previously noted, Olson filed a coordination petition under Code of Civil Procedure section 404.1 in April 2019. After the court denied the petition in June 2019, he did not challenge the denial order by filing a petition for a writ of mandate as authorized by Code of Civil Procedure section 404.6.

discretion to consider arguments and evidence informally offered by plaintiffs pursuing overlapping PAGA claims in separate actions. Indeed, Turrieta and Lyft concede that such plaintiffs may offer objections to courts and that "courts have discretion to consider [those] objections."

Plaintiffs in overlapping PAGA actions may also inform the LWDA of their concerns about proposed settlements. Turrieta and Lyft, although asserting that the state itself has no right to formally involve itself in a PAGA action, concede that the LWDA may informally submit comments on the fairness of proposed settlements and that courts have discretion to consider such comments. We agree with this concession, because we conclude the statutory requirement that proposed settlements "be submitted to the [LWDA] at the same time" they are "submitted to the court" for review and approval (§ 2699, former subd. (*l*)(2)) necessarily implies, at minimum, that the LWDA may offer comments to courts on proposed settlements and that courts have discretion to consider such comments.[24] The dissent fails to explain why, in light of these alternatives to formal

_____

[24] While agreeing with this concession, we emphasize that, in light our analysis and conclusion, we express no opinion on whether the state itself has a right to intervene, to move to vacate the judgment, and/or to require courts to receive and consider settlement objections. Among the unique considerations that may bear on these questions is, as earlier detailed, the Legislature's addition to PAGA in 2016 of detailed provisions regarding the state's involvement in a PAGA action. (§ 2699, former subds. (*l*)(1) [complaint must be provided to the LWDA within 10 days of the action's commencement], (*l*)(2) [proposed settlement must be submitted to the LWDA at the same time it is submitted to the court], (*l*)(3) [judgment and orders awarding or denying civil penalties must be submitted to the LWDA within 10 days of entry].)

intervention, our holding precludes plaintiffs in overlapping PAGA actions from " 'provid[ing] input' " on proposed settlements (dis. opn. of Liu, J., *post*, at p. 8), from "assisting the LWDA" and the courts in carrying out their oversight responsibilities (dis. opn. of Liu, J., *post*, at p. 13), or from playing a "role in ensuring fair settlements for aggrieved employees" (dis. opn. of Liu, J., *post*, at p. 19).[25]

### C. *Moniz*, *Uribe*, and *Accurso*

As earlier noted, Olson relies on *Moniz* and *Uribe* — as does the dissent (dis. opn. of Liu, J., *post*, at pp. 10–11) — but those decisions do not persuade us toward Olson's view because neither considered whether the scope of a PAGA plaintiff's statutory authority to commence and prosecute a PAGA action includes the right to seek intervention on behalf of the state in the overlapping PAGA action of another aggrieved employee. *Uribe*, as here relevant, addressed the standing of a plaintiff in intervention — Isabel Garibay — *to appeal* from a judgment entered upon the court's approval of a settlement covering the class claims and PAGA claim of the original plaintiff, Uribe. When Uribe and the defendant sought preliminary approval of the settlement, "the trial court authorized Garibay," who "had earlier filed" her own, separate "representative PAGA cause of

---

[25] These alternative ways for plaintiffs in overlapping actions to obtain adjudication of identical PAGA claims in a single proceeding and to bring concerns about a proposed settlement to the attention of both the LWDA and the courts also refute the dissent's assertion that our decision "will likely make it harder to pursue PAGA litigation because plaintiffs and their attorneys know that defendants can settle the state's representative claims for the lowest price with no possibility of intervention by plaintiffs with overlapping claims." (Dis. opn. of Liu, J., *post*, at p. 17.)

action," "to intervene as a named party in [Uribe's] lawsuit to oppose the settlement." (*Uribe*, *supra*, 70 Cal.App.5th at p. 989.) Garibay, who "opted out of the class action component of Uribe's lawsuit" (*id.* at p. 990), thereafter filed a complaint in intervention in Uribe's action that "expressly stated" an overlapping PAGA claim (*id.* at p. 1001). After the trial court approved the settlement and entered a judgment confirming it, Garibay appealed. (*Id.* at p. 989.) The Court of Appeal held that she had "standing" on appeal "to challenge the settlement's PAGA component" (*id.* at p. 991) because (1) by intervening, she had officially "becom[e] a party of record" (*id.* at p. 1000), and (2) the "PAGA cause of action" she had asserted "in [Uribe's] lawsuit" by filing the complaint in intervention "was resolved against her" by "the other parties' settlement of Uribe's PAGA claim" (*id.* at p. 1001).

Of significance to our analysis, the Court of Appeal in *Uribe* declared the Court of Appeal's decision in *Turrieta* to be "distinguishable." (*Uribe*, *supra*, 70 Cal.App.5th at p. 1002.) The *Uribe* court expressly "decline[d] to" consider whether "the trial court's intervention rulings" were correct. (*Id.* at p. 1002, fn. 4.) Instead, it "presume[d]" those rulings were "correct" (*id.* at p. 1002) because no one had challenged them on appeal. Thus, *Uribe* simply did not consider whether a PAGA plaintiff's authority includes the right to intervene in another aggrieved employee's separate PAGA action. Moreover, the lynchpin of the *Uribe* court's standing analysis was that (1) Garibay formally asserted a "PAGA cause of action *in [Uribe's] lawsuit*" by filing a complaint in intervention and becoming a named party (*id.* at p. 1001, italics added), (2) the PAGA cause of action "was resolved against her" by "the other parties' settlement of Uribe's PAGA claim" (*ibid.*), and (3) the cause of action would be

"precluded if Uribe's PAGA settlement stands" (*id.* at p. 1002). Thus, not only did the court decline to consider whether intervention was proper, it rested its standing analysis, not on Garibay's authority to assert the state's interest in an overlapping PAGA action, but on the effect of the settlement on the PAGA claim that Garibay had *formally asserted in Uribe's action by filing a complaint in intervention.* For these reasons, *Uribe* sheds no light on whether the scope of a PAGA plaintiff's authority, as the state's representative, includes the right to assert whatever authority the state may have to request intervention in the PAGA action of another plaintiff.[26]

*Moniz* addressed a somewhat similar question of appellate standing but involved a different factual scenario. There, Paola Correa, who had filed a PAGA action, was *denied* permission to intervene in the overlapping PAGA action of Rachel Moniz. (*Moniz*, *supra*, 72 Cal.App.5th at p. 66.) When Moniz and the defendant later moved for court approval of a proposed settlement, "Correa filed an opposition to the motion," "objections to the settlement," and a "motion for attorney fees and costs for herself," and her "counsel moved to intervene for purposes of seeking attorney fees." (*Id.* at p. 68.) The trial court approved the settlement and denied the motions of Correa and her counsel. (*Id.* at p. 70.) After the trial court entered judgment, Correa moved for a new trial and to vacate the judgment, but the trial court denied relief. (*Ibid.*) The Court of Appeal found she had standing to appeal because she had (1) "fil[ed] an appealable motion to set aside and vacate the judgment" (*id.* at p. 71) and (2) been "deputized . . . to prosecute"

---

[26] Because *Uribe* is distinguishable, we express no view regarding the correctness of its holding.

the same PAGA claims that Moniz had settled (*id.* at p. 73). Regarding the latter point, the court explained: "[W]here two PAGA actions involve overlapping PAGA claims and a settlement of one is purportedly unfair, it follows that the PAGA representative in the separate action may seek to become a party to the settling action and appeal the fairness of the settlement as part of his or her role as an effective advocate for the state. Correa has done just this. Thus, she represents interests that are sufficiently aggrieved to" meet the requirements for appellate standing. (*Ibid.*) This conclusion, the Court of Appeal explained, was not in "tension" with its earlier affirmance of the "denial of Correa's motion to intervene" because, in rendering that affirmance, the court had "assumed without deciding that [Correa] had an interest sufficient for intervention." (*Id.* at p. 73, fn. 10.) According to the *Moniz* court, the Court of Appeal in *Turrieta*, in reaching a contrary conclusion, "appear[ed] to have discounted the[] role" of PAGA plaintiffs who have brought overlapping PAGA claims "as designated proxies of the state." (*Moniz*, at p. 73.)

For several reasons, *Moniz*'s analysis is unpersuasive. First, according to the opinion in that case, the parties who contested Correa's standing to appeal based their challenge solely on the fact that Correa was not "a party of record," and they did "not argue in their briefing that . . . she [was] not 'aggrieved' by the judgment confirming the settlement." (*Moniz*, *supra*, 72 Cal.App.5th at pp. 71, 72.) Thus, the latter issue was uncontested and the court addressed it without the benefit of any legal input from counsel. Second, and likely related to the first, the court made no examination of PAGA's text or of the question now before us: Whether the scope of a PAGA plaintiff's authority includes the authority to "seek to become a party to

the settling action." (*Moniz*, at p. 73.) Nor did the court consider any of the complex problems, as discussed above, that arise from the conclusion that a PAGA plaintiff's authority includes the power of intervention, or whether recognizing such authority would further or undermine PAGA's purpose. Without examining any of these issues, the court declared that such authority necessarily "follows" from and is "part of" a PAGA plaintiff's "role as [a] designated prox[y] of" and "effective advocate for the state." (*Moniz*, at p. 73.) Having here considered these matters with the benefit of extensive briefing from the parties and amici curiae, we conclude, for reasons stated above, that the scope of a PAGA plaintiff's authority does not include this intervention power. We disapprove *Moniz v. Adecco USA, Inc.*, *supra*, 72 Cal.App.5th 56 insofar as its analysis and conclusion conflict with ours.[27]

---

[27] We note that, in a similar context, the Ninth Circuit affirmed a trial court's denial of a PAGA plaintiff's motion to intervene in another aggrieved employee's PAGA action asserting overlapping claims. (*Callahan v. Brookdale Senior Living Communities, Inc.* (9th Cir. 2022) 42 F.4th 1013, 1017.) Applying federal intervention law, the Ninth Circuit held that the proposed intervenor had failed to establish one of the federal requirements for mandatory intervention: that her interests were not "adequately represent[ed]" by the named plaintiff. (*Id.* at p. 1022.) Regarding permissive intervention, the Ninth Circuit, again applying federal standards, found no abuse of discretion in the trial court's reliance on its view that (1) the proposed intervenor and named plaintiff "represent[ed] the same legal right and interest," and (2) participation by the proposed intervenor "would not significantly contribute to the factual development of issues." (*Id.* at p. 1022.) In affirming the denial order, the Ninth Circuit "assume[d] without deciding that [the proposed intervenor] . . . ha[d] an interest in recovering penalties pursuant to PAGA that [was] sufficient to" show, as federal law requires for mandatory intervention, that the

The dissent also relies heavily on *Accurso* (dis. opn. of Liu, J., *post*, at pp. 6–8), but we find that decision to be no more persuasive than *Uribe* or *Moniz*. Contrary to what the dissent suggests, the *Accurso* court did not consider or comment on whether the intervention motions there at issue were properly denied "for lack of authority *under PAGA*." (Dis. opn. of Liu, J., *post*, at p. 7, italics added.) Instead, it focused only on the interpretation and application *of the general intervention statute*, section 387. For this reason, *Accurso* does not, as the dissent indicates, shed light on whether PAGA confers on PAGA plaintiffs the authority to "assert[] the *state's interest* in intervening in [the] overlapping PAGA suit" of someone else. (Dis. opn. of Liu, J., *post*, at p. 6.)

## II. Motion To Vacate And Standing To Appeal

Because, as a general matter, "only parties of record may appeal," a person "denied the right to intervene in an action ordinarily may not appeal from a judgment subsequently entered in the case." (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 736.) "Nevertheless," a person denied intervention "who is legally 'aggrieved' by a judgment may become a party of record and obtain a right to appeal by moving to vacate the judgment pursuant to Code of Civil Procedure section 663. [Citations.] One is considered, 'aggrieved' whose rights or interests are injuriously affected by the judgment. [Citations.] [The] interest ' "must be immediate, pecuniary, and substantial

---

applicant has a " 'significantly protectable' interest relating to the property or transaction which is the subject of the action." (*Id*. at p. 1020.) Any such assumption appears to be in tension with our analysis and conclusion, at least insofar as proposed intervenors are relying exclusively on *the state's* interest and their status as the state's agent or representative.

and not nominal or a remote consequence of the judgment." ' "[28] (*Id.* at pp. 736–737.)

Olson's assertion of authority to move to vacate the judgment and thus gain standing to appeal rests largely on the same arguments he made in asserting a right to seek intervention. Relying solely on his status as the state's "deputized" representative, he argues: The state "is aggrieved by the judgment" because the settlement "resolve[d] [its] claims for .05% of their value." Because "the State is aggrieved by the judgment and he has standing," as the state's deputized representative, "to assert the State's interest," he "meets the standard to move to vacate the judgment" and to appeal.

Olson's argument, which is based on the same analysis as his intervention argument, is unpersuasive for essentially the same reasons. The provisions of PAGA contain no language expressly referencing the power to make a motion to vacate the judgment in another aggrieved employee's PAGA action asserting overlapping claims, and concluding that this power is necessarily implied in a PAGA plaintiff's authority to commence and prosecute a PAGA action on the state's behalf would be inconsistent with the statutory scheme as a whole. When the Legislature expressly addressed the issue of oversight, it looked only to the courts and to the LWDA, and it provided for the funds it deemed necessary for the LWDA to effectively perform its

---

[28] As here relevant, section 663 of the Code of Civil Procedure provides that "the party aggrieved" by a court judgment may have the judgment "set aside and vacated by the same court, and another and different judgment entered," upon filing a motion and showing an "[i]ncorrect or erroneous legal basis for the decision, not consistent with or not supported by the facts."

statutorily assigned oversight functions consistent with existing budgetary constraints. The omission of any mention or suggestion of oversight by anyone else is significant given the unanswered questions that would arise from adopting Olson's construction, which could leave courts faced with multiple motions to vacate and multiple appeals in a single PAGA action, filed by multiple PAGA plaintiffs and their counsel, all purporting to represent the interests of the same client: the state. In addition to these procedural problems, Olson's view implicates conflicting policy arguments that should be evaluated and addressed by the Legislature in its policymaking role, not by this court as part of interpreting the statute. Nothing in PAGA's text, the statutory scheme, or the legislative history suggests the Legislature understood or intended an aggrieved employee's authority to commence and prosecute a PAGA action on the state's behalf to include the power to move to vacate a judgment obtained by another aggrieved employee — representing the same state interest — after a proposed settlement has been submitted for review to both the trial court and the LWDA, and the court has determined that the proposed settlement "is fair to those affected." (*Williams*, *supra*, 3 Cal.5th at p. 549.)

Olson argues that the "[a]bsence [in PAGA] of [e]xpress [a]uthorization" to move to vacate the judgment in another plaintiff's PAGA action is of no significance because his "right . . . to set aside [the] judgment[]" in Turrieta's action on the state's behalf is separately established by Code of Civil Procedure, section 663. Nothing in PAGA, Olson asserts, establishes "an exception . . . for the common civil procedures and remedies available to civil litigants," "remove[s] or supplant[s] the regular . . . standards [for] set[ting] aside an

erroneous order or judgment," or "operates as a complete bar to [his] participation as . . . [an] aggrieved party, according to [those regular] standards."

We find Olson's arguments unpersuasive. As noted above, Olson asserts he may move to vacate the judgment because "[t]he state . . . is a party aggrieved by [that] judgment" and, as the state's deputized representative, "he has standing to assert the State's interest." But section 663 of the Code of Civil procedure, while authorizing "the party aggrieved" by a judgment to move for its vacatur, says nothing in general about the authority of someone *other than* "the party aggrieved" to file such a motion on the aggrieved party's behalf. A fortiori, it says nothing about the specific issue before us: Whether the scope of a PAGA plaintiff's authority as the state's representative includes the authority to move, on behalf of the state, to vacate the judgment obtained in a separate action by *another* PAGA plaintiff who was acting as the state's representative regarding the same claims. As earlier noted, Olson concedes that the provisions of PAGA do not authorize him to "act 'on the State's behalf for all purposes'" or confer on him "the sweep of the LWDA's entire authority." This concession implicitly raises the question of what, precisely, *is* within the scope of his authority to act on the state's behalf. For reasons stated above, we conclude that the scope of an aggrieved employee's authority to commence and prosecute a PAGA action on the state's behalf does not include the authority to move to vacate the judgment obtained by *another* PAGA plaintiff on the state's behalf in a separate PAGA action.[29]

---

[29] Turrieta and Lyft also argue that because the state has no right to move to vacate the judgment that Turrieta obtained,

### III.  Right to Object

Olson's arguments for the existence of a right to object to the proposed settlement mirror his arguments for the existence of the rights to intervene and to move to vacate.  He reasons: The right to object "follows" from his status "as the State's proxy" and the fact that the state "deputized [him] to pursue [the] claims" at issue in Turrieta's action.  This "logical," "common sense reading of the statute" is "consistent with the State's ability" under PAGA "to deputize multiple individuals" to simultaneously seek recovery as to identical claims; "[i]n other words, for the same reason that PAGA was enacted — a shortage of State personnel employed in an enforcement capacity — the possibility of additional deputies provides a check against unfair settlements that the LWDA does not have the capacity to review."  It is also consistent with the provision of PAGA requiring submission to the LWDA of any proposed settlement.  This requirement would "serve" no "purpose . . . if the LWDA, *or its agent*, [were] not permitted to weigh in before any such settlement [is] approved."  (Italics added.)

On this score, we again find Olson's arguments unpersuasive.  As previously noted, PAGA is silent regarding a PAGA plaintiff's authority to object to a proposed settlement in another PAGA plaintiff's action and, in light of all the relevant considerations, his arguments fail to convince us that such authority necessarily "follows" from the authority to commence and prosecute a civil action.  As earlier discussed, although the PAGA provisions that apply here expressly contemplate and

---

Olson has no derivative right as the state's proxy.  We express no view on this issue because, to resolve Olson's claim, it is unnecessary to do so.

provide for *the LWDA's* involvement in a PAGA plaintiff's action, they say nothing about the involvement of anyone else, including, as here relevant, PAGA plaintiffs who have brought separate PAGA actions asserting identical claims. Were we to conclude that the scope of an aggrieved employee's authority to act on the state's behalf includes the right to file objections to a proposed settlement in the PAGA action of another aggrieved employee acting on the state's behalf and representing the same state interest, the absence of any PAGA provision addressing this subject would, as noted above, give rise to numerous complex and unanswered questions about the relative authority of the PAGA plaintiff who filed and agreed to settle the action, and nonparty PAGA plaintiffs who object to the settlement.[30]

This silence also undermines Olson's reliance on the PAGA provision that requires submission of proposed settlements "to the agency," i.e., the LWDA. (§ 2699, former subd. (*l*)(3).) When the Legislature established this requirement in 2016 as part of its effort to address oversight of PAGA actions, had it intended, as Olson asserts, to authorize other "agent[s]" of the LWDA "to weigh in before any such settlement [is] approved," it likely would have mentioned those "agent[s]" in some way instead of requiring only that proposed settlements "be submitted *to the agency*" (§ 2699, former subd. (*l*)(3), italics added). As Lyft

---

[30] Consistent with this conclusion, the Court of Appeal in *Moniz, supra*, 72 Cal.App.5th at page 78, disagreed that the trial court in that case had erred by refusing to "entertain objections from aggrieved employees pursuing similar PAGA representative actions." The Court of Appeal explained: "PAGA does not provide that aggrieved employees must be heard on the approval of PAGA settlements" and "we will not read a requirement into a statute that does not appear therein." (*Id.* at p. 79.)

argues, "Because [the Legislature added] no notice requirement for other aggrieved employees, . . . it is implausible that the Legislature somehow created [for nonparty PAGA plaintiffs] an implicit . . . right to object." Moreover, the consequence of Olson's reading — a PAGA plaintiff, in order to settle an action, might have to overcome *multiple* objections filed by *multiple* nonparty PAGA plaintiffs — would implicate the legislative concern, reflected in PAGA's legislative history, about the difficulty of pursuing PAGA litigation.

Finally, insofar as Olson bases his argument on the "reason that PAGA was enacted" — i.e., "a shortage of State personnel employed in an enforcement capacity" — we reject it for the reasons stated above. To reiterate, the legislative history shows that when the Legislature expressly addressed the issue of oversight, it looked only to the courts and to the LWDA, and it provided the funds it deemed necessary for the LWDA to effectively perform its statutorily assigned oversight functions in light of the State's budget. Olson's unsupported assertions regarding the LWDA's current capacity to perform its functions do not persuade us to adopt his view.

Olson also asserts that finding a "proxy's[] right to object is consistent with the [PAGA's] aim," "recognizes [it] as a vehicle to enforce public rights and deter future violations," and "serves its legislative purpose[s]," i.e., "to protect the interests of workers," " 'to achieve maximum compliance with state labor laws,' " and "to 'advance the state's public policy of affording employees workplaces free of Labor Code violations, notwithstanding the inability of state agencies to monitor every employer or industry.' " Failing to recognize this right, on the other hand, would " 'ill-serve[]' " these "purpose[s]." From a policy perspective, because parties who have agreed to settle

"are no longer adverse," finding that another state "proxy" may object — and submit "valuable information that provides a lens through which the court may see the settlement terms in sharper relief" — "helps ensure that the court's required review of the settlement is meaningful, informed and fair to those affected," and "guard[s] against the risk that" the settling parties "may be inclined to promote a settlement that is . . . advantageous to them, but . . . inconsistent with the purposes of PAGA, or even inconsistent with the record in the case." Additional "support" for finding that another proxy has a right to object exists in section 187 of the Code of Civil Procedure, which, Olson asserts, "provides that when jurisdiction of a matter is conferred on a court by statute, the court should adopt a suitable mode of proceeding that 'appears most conformable to the spirit of the Code.' "

Of course, Turrieta and Lyft disagree with Olson's claim that his reading would serve PAGA's purpose and public policy. Lyft asserts that "settlement objections present an opportunity for disruption and delay unrelated to the merits of a settlement," and that "[r]estricting objector interference in the PAGA settlement context allows for prompt payment of PAGA penalties to the state by preventing those payments from being held up by meritless objections." Turrieta asserts that PAGA plaintiffs who have filed separate PAGA actions — and their counsel — are not "neutral parties" because of their pecuniary interest in obtaining an award of attorney's fees and costs, and that they would have "an irresistible economic incentive for objection . . . no matter how worthy the recovery." It "is a bad idea," Turrieta argues, to "forc[e]" PAGA plaintiffs trying to settle actions they have filed "to battle other PAGA litigants who are improperly incentivized to object to every settlement."

As earlier explained, nothing in PAGA's text, statutory scheme, or legislative history suggests the Legislature understood or intended an aggrieved employee's authority to commence and prosecute a PAGA action on the state's behalf to include the power to file objections to the settlement reached by another aggrieved employee representing the same state interest and also acting on the state's behalf.

Finally, Olson's argument that section 187 of the Code of Civil Procedure "provides support" for his reading of PAGA rests on a misreading of that section's text. The statute does not, as Olson asserts, provide that courts "should" do anything. Instead, the clause of the statute that Olson only *partially* quotes actually provides that a court, in exercising its jurisdiction, "*may*" adopt "any suitable process or mode of proceeding" that "appear[s] most conformable to the spirit of" the Code of Civil Procedure, "if the course of proceeding [is] not specifically pointed out by [that] Code or the statute" conferring jurisdiction on the court. (Code Civ. Proc., § 187, italics added.) In other words, Code of Civil Procedure section 187 "gives [a] trial court *the discretion* to create its own reasonable procedure in the exercise of its jurisdiction where the law provides no specific procedure." (*Triyar Hospitality Management, LLC v. WSI (II)-HWP, LLC* (2020) 57 Cal.App.5th 636, 641, italics added.) Assuming, without deciding, that the trigger for action under this section exists here — i.e., "the law provides no specific procedure" (*ibid.*) — nothing in "the discretion" (*ibid.*) the section confers on trial courts establishes, suggests, or even relates to the question of whether "Olson's proxy" to pursue PAGA claims on the state's behalf includes the *right* "to object[] to the settlement of those claims" by another PAGA plaintiff in a separate action. Nor does this statutory grant of judicial

*discretion* support Olson's claim that a court evaluating a PAGA settlement obtained by the PAGA plaintiff who filed the action "*must*" consider objections raised by any and every nonparty "proxy" of the State.[31]  (Italics added.)

## CONCLUSION

For the reasons stated above, we hold that an aggrieved employee's status as the State's proxy in a PAGA action does not give that employee the right to seek intervention in the PAGA action of another employee, to move to vacate a judgment entered in the other employee's action, or to *require* a court to receive and consider objections to a proposed settlement of that action.  At the same time, we reiterate that the Legislature, in its policymaking role, remains free to consider the questions we have addressed and resolved in this opinion — along with the various related policy arguments — and to decide whether statutory recognition of the rights Olson asserts is wise and/or necessary to achieve PAGA's goals.

---

[31]    Turrieta also argues that because the state has no "right [under PAGA] to formally . . . object" to a proposed settlement, Olson has no derivative right as the state's "proxy."  Lyft, by contrast, acknowledges that the state "may have a right to object under PAGA."  We express no view on this issue because, to resolve Olson's claim, it is unnecessary to do so.

## DISPOSITION

The Court of Appeal's judgment is affirmed.


**JENKINS, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**

TURRIETA v. LYFT, INC.

S271721


Concurring Opinion by Justice Kruger


I concur in the majority opinion, which I have signed. I write separately for three reasons.

First, although the majority does not decide the issue, I agree with Justice Liu that there is no apparent basis for questioning the right of the state to participate in litigation brought by a private party under the Private Attorneys General Act of 2004 (PAGA) (Lab. Code, § 2698 et seq.), since, after all, the state is the real party in interest. Indeed, the parties made clear at oral argument that they do not genuinely dispute the state's authority to participate as a party in a PAGA action brought by a private plaintiff; they merely question whether the state must move to intervene or whether the state is already automatically a party, an issue that need not be decided here.

But I also think it is a different question whether a plaintiff in a different, overlapping PAGA action has the same powers as the state to enter the action as a party. The statute does not provide clear answers. It is true that PAGA deputizes private parties to pursue Labor Code enforcement on the state's behalf. But while it is possible for the state's interests to be represented in court by multiple governmental officials with competing perspectives, this is relatively rare. (Cf., e.g., *Berger v. North Carolina State Conference of the NAACP* (2022) 597 U.S. 179, 184.) It would be especially unusual for multiple private parties to compete to represent the state's interests in

1

the same litigation.  This is a possibility the Legislature has effectively foreclosed in other, prototypical qui tam proceedings. (Cf., e.g., Gov. Code, § 12652, subd. (c)(10) [codifying a first-to-file rule:  when a person brings an action under the California False Claims Act, "no other person may bring a related action based on the facts underlying the pending action"].)  Given that background, I agree with the majority that, absent a clearer indication of the Legislature's intent to permit that unusual result here, plaintiff Brandon Olson's pursuit of the state's enforcement interests in *Olson v. Lyft, Inc.* does not, standing alone, supply a sufficient basis for him to intervene as a party in *Turrieta v. Lyft, Inc.*, a different suit brought by a different private plaintiff.

Second, the question we address in this case is limited to an argument for intervention based solely on a private PAGA plaintiff's statutory authorization to act as a proxy for the state in the context of a particular lawsuit.  As the majority notes, this case does not present any question about private plaintiffs' ability to intervene to vindicate their own personal interests, as employees who have been aggrieved by the employer's practices. (Maj. opn., *ante*, at p. 14, fn. 6; cf. *Simpson Redwood Co. v. State of California* (1987) 196 Cal.App.3d 1192, 1200.)  Resolution of those issues must await another case in which they have been briefed and argued.

Finally, I wish to underscore the undisputed point that a trial court has a duty to ensure the fairness and soundness of any settlement of PAGA claims alleging an employer's Labor Code violations.  (Lab. Code, § 2699, subd. (s)(2), former subd. (*l*)(2).)  Part of that duty includes carefully considering any indications that the settlement has benefited the parties involved at the expense of undermining the protections the

Labor Code confers on California's workers.  This duty applies regardless of whether a particular aggrieved employee has the formal right to intervene as a party in a lawsuit brought by another.

    With these observations, I concur.


                                                **KRUGER, J.**

**I Concur:**

**GROBAN, J.**

TURRIETA v. LYFT, INC.

S271721

Dissenting Opinion by Justice Liu

Today's opinion reaches the wrong result because it starts in the wrong place. The court holds that the Private Attorneys General Act of 2004 (PAGA) bars a deputized plaintiff from seeking intervention on behalf of the state under Code of Civil Procedure section 387 or moving to appeal from a judgment under Code of Civil Procedure section 663 in the overlapping action of another PAGA plaintiff. (Maj. opn., *ante*, at pp. 2–3; all undesignated statutory references are to the Code of Civil Procedure.) The court arrives at this conclusion without answering a preliminary question that the parties have briefed: whether the state itself may seek to intervene in a PAGA suit under section 387 or move to vacate a judgment under section 663. (Maj. opn., *ante*, at p. 20, fn. 9, 53, fn. 24.) By avoiding the embedded inquiry of "whatever authority the state may have" to intervene or appeal from a judgment (*id.* at p. 56), the court elides a key aspect of how PAGA works and does not follow the statutory scheme to its logical conclusion.

The court holds that the same or overlapping PAGA claims initiated by different plaintiffs *must* be prosecuted in separate actions, regardless of what a trial court might view as the benefits of another PAGA plaintiff's intervention. This result is contrary to basic principles undergirding the rules of civil procedure, which facilitate (even if they do not require) adjudication of the same claims in a single proceeding. It also deprives trial courts of discretion to permit knowledgeable and

1

interested plaintiffs to intervene in suits, even when their participation would help ensure that proposed settlements are fair to aggrieved employees and the state. And it deprives appellate courts of the opportunity to consider challenges to allegedly wrongful settlements. Taken together, the court's decision creates a substantial risk of auctioning the settlement of representative PAGA claims to the lowest bidder and insulating those settlements from appellate review. These consequences, which the court views as required by PAGA despite the lack of textual support, are inconsistent with the statute's purpose: to maximize enforcement of the Labor Code by permitting private attorneys general to prosecute labor violations against defendants on behalf of the state.

Although the court misconstrues PAGA, the Legislature is not without recourse. It may wish to expressly authorize PAGA plaintiffs to seek intervention and to move to vacate a judgment in a parallel proceeding as a means of augmenting the state's limited enforcement capacity. At the least, it may wish to examine whether, in light of today's decision, the Labor and Workforce Development Agency (LWDA) has adequate resources to carry the burden of ensuring fair PAGA settlements without the assistance of other deputized PAGA plaintiffs. California is a big state, and the Division of Labor Standards Enforcement (DLSE), as amicus curiae, asserts that the LWDA lacks the resources to supervise settlement negotiations in each case, as would be required for it to intervene in appropriate cases and appeal from unfair settlements. Today's opinion steers PAGA into avoidable shoals, and the unfortunate result calls for legislative attention, lest the statute's goal of strengthening Labor Code enforcement be thwarted by settlement incentives that drive a race to the bottom.

## I.

Although this court has not previously considered whether the state has a right to intervene in a PAGA suit, the answer is straightforward. As the court in *California Business & Industrial Alliance v. Becerra* (2022) 80 Cal.App.5th 734 explained, despite PAGA's lack of "an express provision authorizing the executive to intervene" in an action, "California law independently *requires* courts to permit intervention in an action by any person who 'claims an interest relating to the property or transaction that is the subject of the action and that person is so situated that the disposition of the action may impair or impede that person's ability to protect that interest, unless that person's interest is adequately represented by one or more of the existing parties' (Code Civ. Proc., § 387, subd. (d)(1)(B)) and allows intervention at the discretion of the trial court by any person who 'has an interest in the matter of litigation, or in the success of either of the parties, or an interest against both.' (*Id.,* subd. (d)(2)." (*Becerra*, at p. 748.) Thus, "California law plainly permits the Attorney General to intervene to protect the state's interest in recovering its share of the civil penalties and oppose judicial approval of the settlement. Indeed, that is the obvious purpose of the provisions of PAGA requiring timely notice to be given to the executive upon submission of a proposed settlement to the court for approval." (*Ibid.*)

*Becerra*'s holding is in line with our case law that has held for over a century that "[a]ny person who is a real party in interest may intervene in any type of action or proceeding." (*Cohn v. County Board of Supervisors of Los Angeles County* (1955) 135 Cal.App.2d 180, 184, citing *Robinson v. Crescent City etc. Co.* (1892) 93 Cal. 316, 319 (*Robinson*) [holding that § 387

"does not limit the right to intervene to any particular kind or class of actions or proceedings" and that a plaintiff who is "the real party in interest" was therefore "clearly interested in the matter in litigation" and thus could intervene].) In PAGA suits, like other qui tam actions, "[t]he government entity on whose behalf the plaintiff files suit is always the real party in interest." (*Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 382 (*Iskanian*), abrogated in part on other grounds by *Viking River Cruises, Inc. v. Moriana* (2022) 596 U.S. 639.)

Further, the basic premise that a real party in interest is nevertheless a "nonparty" who can intervene under section 387 is consistent with federal precedent. In *United States ex rel. Eisenstein v. New York City* (2009) 556 U.S. 928, a federal False Claims Act case, the high court held that the United States, despite being the " 'real party in interest' " in the action, was not a " 'party' " to a qui tam action for the purpose of determining notice of appeal filing timelines. (*Id.* at p. 934.) The high court explained, "[T]he United States' status as a 'real party in interest' in a *qui tam* action does not automatically convert it into a 'party.' " (*Ibid.*) "The phrase, 'real party in interest,' is a term of art utilized in federal law to refer to an actor with a substantive right whose interests may be represented in litigation by another." (*Id.* at pp. 934–935.)

Plaintiff Tina Turrieta and defendant Lyft, Inc. argue that because analogous qui tam actions, such as suits under the California False Claims Act, include express provisions for state intervention (see Gov. Code, § 12652, subds. (a)(3), (f)(2)(A)), while PAGA does not, we can infer from PAGA's silence the Legislature's intent to disallow state intervention in the PAGA context under section 387. But the various provisions for state intervention in the California False Claims Act are designed to

clarify when government entities enjoy an "unconditional" right of intervention (§ 387, subd. (d)(1)(A)) as opposed to when they must satisfy the requirements for mandatory intervention (*id.*, subd. (d)(1)(B)) or permissive intervention (*id.*, subd. (d)(2)). (See Gov. Code, § 12652, subd. (a)(3) ["The prosecuting authority shall have the right to intervene in an action brought by the Attorney General under this subdivision within 60 days after receipt of the complaint pursuant to paragraph (2). The court may permit intervention thereafter upon a showing that all of the requirements of Section 387 of the Code of Civil Procedure have been met."].) All that the comparison to qui tam statutes shows is that the Legislature, by not providing for *unconditional* intervention by the state in PAGA actions, intended for the state to satisfy the ordinary requirements of section 387 should it wish to intervene in a PAGA suit. To read the absence of express provision as a bar to the state's ability to intervene in a PAGA suit would effect a revision of the statute and upset over a century of black letter law that real parties in interest have a right to intervene in suits under section 387. (See *Robinson, supra*, 93 Cal. at p. 319.)

Once it is acknowledged that the Attorney General has a right to seek intervention in any PAGA action under section 387, it becomes clear that a private attorney general — a deputized PAGA plaintiff acting as a representative of the state's interest — has a right to seek intervention in the PAGA action of another plaintiff prosecuting the same or overlapping claims.

Our case law over the decades is consistent: When a PAGA plaintiff sues an employer, the plaintiff acts as a representative of the state's labor law enforcement agencies. "In a lawsuit brought under the act, the employee plaintiff represents the same legal right and interest as state labor law

enforcement agencies — namely, recovery of civil penalties that otherwise would have been assessed and collected by the Labor Workforce Development Agency." (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 986 (*Arias*); accord, *Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court* (2009) 46 Cal.4th 993, 1003; *Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 81 (*Kim*); see also *Williams v. Superior Court* (2017) 3 Cal.5th 531, 548 ["Representative PAGA actions 'directly enforce *the state's* interest in penalizing and deterring employers who violate California's labor laws.' "].) Petitioner Brandon Olson asserts the *state's interest* in intervening in Turrieta's overlapping PAGA suit. In other words, Olson has an interest in his representative PAGA claim that is the same as that of the LWDA. Because he has the same interest, he also has a right to move for intervention under section 387.

This conclusion accords with that of the Court of Appeal in *Accurso v. In-N-Out Burgers* (2023) 94 Cal.App.5th 1128 (*Accurso*), review granted, November 29, 2023, S282173. In considering the right of a PAGA plaintiff to intervene in an overlapping PAGA action, the court in *Accurso* reasoned that "ordinary rules of civil procedure, supplemented where necessary and appropriate by rules governing coordination of complex cases, are adequate to the task of resolving the difficult procedural problems that arise when multiple LWDA-deputized PAGA claimants sue the same target employer in different courts." (*Accurso*, at p. 1148, fn. omitted.) The Court of Appeal adopted the phrasing of the federal standard for intervention under Rule 24 of the Federal Rules of Civil Procedure to hold that "non-party PAGA claimants who seek to intervene in overlapping PAGA cases must have a 'significantly protectable interest' that meets the threshold requirements of section 387."

(*Accurso*, *supra*, 94 Cal.App.5th at p. 1145.)  The court further held that "[a] personal interest is not required" to satisfy this showing and that the proposed intervenors, "[h]aving been deputized to pursue PAGA claims on behalf of the State of California that may be foreclosed by a settlement or adjudication of this case . . . [,] have significantly protectable interests for the purposes of section 387." (*Id.* at pp. 1145–1146.)

*Accurso* concluded that the trial court's denial of mandatory intervention under section 387, subdivision (d)(1)(B) was proper, but not for lack of a significantly protectable interest or for lack of authority under PAGA.  (*Accurso, supra*, 94 Cal.App.5th at pp. 1152–1153, review granted.)  Rather, the court explained, the proposed intervenors had not met their burden of proving a modest impairment to their rights (there was not yet a proposed settlement) or the inadequacy of representation of one or more existing parties.  (*Ibid.*)

But the Court of Appeal went on to find the denial of permissive intervention to be an abuse of discretion because the trial court erred as a matter of law in holding that the proposed intervenors did not have a " 'significantly protectable interest.' " (*Accurso, supra*, 94 Cal.App.5th at p. 1145, review granted.) The court reasoned that "permissive intervention supplies a means to make sure the perspective of potentially affected nonparty PAGA claimants is included in the settlement approval process." (*Id.* at p. 1153.)  "Naturally, the proponents of a hard-won settlement will have little or no incentive to point out that the proposed settlement terms exceed anyone's authority; that the releases given are overbroad; that the consideration is inadequate; or that the allocation of money to be paid is in any respect unfair.  As a result, trial courts are often faced with the sometimes challenging task of spotting

deficiencies in a proposed PAGA settlement without assistance from anyone other than participants to the settlement negotiations." (*Id.* at pp. 1153–1154.) Thus, "in situations where PAGA claimants with their own overlapping claims in other pending cases show up and wish to provide input, we see no reason why they should not be given a seat at the table. And should trial courts wish to ensure that such PAGA claimants are meaningfully involved in the settlement approval process, permissive intervention *even before the settlement approval process begins* may be a way to ensure that they are fully prepared to do so." (*Id.* at p. 1154.) The appellate court remanded to the trial court to consider the motion for permissive intervention, which it considered "a case management tool busy trial judges may wish to utilize in managing PAGA cases when a potentially valuable source of information is available." (*Id.* at p. 1155–1156.)

To be sure, the identity of interest between a PAGA plaintiff and the LWDA in a parallel, representative action does not mean that a PAGA deputy is authorized to act on behalf of the state for all purposes. (Maj. opn., *ante*, at p. 19). It simply reflects the identity of interest between the state and a PAGA plaintiff in enforcing civil penalties for labor violations and a PAGA plaintiff's statutory authorization to prosecute the claim on the state's behalf to its resolution. (*Adolph v. Uber Technologies, Inc.* (2023) 14 Cal.5th 1104, 1117 ["Once deputized, the aggrieved employee has authority to 'seek any civil penalties the state can.' "].)

Nor does their identity of interest mean that a PAGA plaintiff and the LWDA could each obtain mandatory or permissive intervention under section 387 upon the same showing. Courts would be well within their discretion to require

a more "compelling showing" of inadequacy of representation for another PAGA plaintiff to obtain mandatory intervention than for the LWDA, given their different institutional roles and the different incentives involved in the litigation. (*Callahan v. Brookdale Senior Living Communities, Inc.* (9th Cir. 2022) 42 F.4th 1013, 1021 (*Callahan*).) As for permissive intervention, courts would have more reasons and therefore greater discretion to deny such intervention by another PAGA plaintiff with an overlapping suit as compared to the LWDA. (See *Edwards v. Heartland Payment Systems, Inc.* (2018) 29 Cal.App.5th 725, 736 [courts may deny permissive intervention if it deems that the reasons in favor of intervention are outweighed by objections to it].)

Importantly, trial courts would retain ample discretion to weed out unhelpful "professional objectors" who may be primarily seeking a cut of attorney's fees or who otherwise would not add value to the settlement approval process. In fact, in the class action context, we have recognized that formal intervention motions provide an effective process for trial courts to screen out opportunistic private plaintiffs who object to settlements only to obtain a share of attorney's fees. (*Hernandez v. Restoration Hardware, Inc.* (2018) 4 Cal.5th 260, 272 [requiring formal intervention to obtain the right to appeal creates a "manageable process . . . that promotes judicial economy" and helps to head off "[m]eritless objections" that disrupt settlements "by feeding off the fees earned by class counsel"]; but cf. maj. opn., *ante*, at pp. 47–48 [criticizing my reliance on *Hernandez* while confirming it says what I cite it to say].)

Just as a PAGA plaintiff has a " 'significantly protectable interest' " in the resolution of a parallel suit such that she or he

may seek intervention under section 387 (*Accurso, supra*, 94 Cal.App.5th at p. 1144, review granted), a PAGA plaintiff is also "aggrieved" by a deficient judgment in an overlapping action such that she or he has a right to move to vacate the judgment under Code of Civil Procedure section 663. (See § 663 ["A judgment . . . may, upon motion of the party aggrieved, be set aside and vacated by the same court . . . ."]; *County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 737 ["One is considered 'aggrieved' whose rights or interests are injuriously affected by the judgment."].)

This conclusion is in accord with *Moniz v. Adecco USA, Inc.* (2021) 72 Cal.App.5th 56, 73, where the court held that a PAGA plaintiff in a parallel suit against the same employer was aggrieved by the judgment confirming the settlement and had standing to appeal. The Court of Appeal reasoned, "Accepting the premise that PAGA allows concurrent PAGA suits . . . [citation], where two PAGA actions involve overlapping PAGA claims and a settlement of one is purportedly unfair, it follows that the PAGA representative in the separate action may seek to become a party to the settling action and appeal the fairness of the settlement as part of his or her role as an effective advocate for the state." (*Moniz, supra*, 72 Cal.App.5th at p. 73, fn. omitted.)

Similarly, in *Uribe v. Crown Building Maintenance Co.* (2021) 70 Cal.App.5th 986, 999–1002, the court held that a PAGA plaintiff who had been granted intervention had standing to appeal a PAGA settlement reached by the original parties to the action. "Under these circumstances," the court explained, the intervening plaintiff, Garibay, had "standing to appeal because, having intervened and yet unable to opt out of the other parties' settlement of Uribe's PAGA claim, Garibay's PAGA

cause of action in this same lawsuit was resolved against her by the trial court's entry of judgment on its final approval of the settlement. She is therefore a party 'aggrieved' by the judgment." (*Id.* at p. 1001.)

## II.

Against this weight of precedent, today's opinion concludes that PAGA bars a deputized plaintiff from seeking to intervene in overlapping PAGA actions to assert the state's interest in an adequate settlement and from moving to vacate a deficient judgment. While acknowledging that the statute is silent on the issue and that the absence of express authorization is not determinative (maj. opn., *ante*, at p. 22), the court nevertheless infers from the statute a bar on intervention. This inference does not withstand scrutiny.

To begin, the court reasons that "[o]ther aspects of the statutory scheme suggest that recognition of the intervention power Olson asserts is neither reasonably necessary to effectuate PAGA's purpose nor consistent with the Legislature's intent." (Maj. opn., *ante*, at p. 27.) The only other aspect of the statutory scheme that the court can point to is the statute's provision that the LWDA receive notice of proposed settlements and copies of PAGA judgments. (Lab. Code, § 2699, subd. (s)(2), (s)(3) [former subd. (*l*)(2), (*l*)(3)].) According to the court, this is evidence that "the Legislature neither envisioned nor intended that the scope of a duly deputized PAGA plaintiff's power to prosecute claims on behalf of the state includes the power to intervene in the separate PAGA action of another plaintiff who has been duly deputized to prosecute the same claims on the state's behalf." (Maj. opn., *ante*, at p. 28.) Had the Legislature envisioned other PAGA plaintiffs playing such a role, the court

says, it would have provided for those litigants to receive notice. (*Id.* at p. 29.) The court infers from the legislative history of the 2016 amendments (Stats. 2016, ch. 31, § 189), which added the LWDA settlement notice provision and required court approval of all PAGA settlements, that the Legislature intended to preclude other PAGA plaintiffs from intervening to ensure reasonable settlements. (Maj. opn., *ante*, at pp. 33–37, citing Dept. of Finance, Enrolled Bill Report on Sen. Bill No. 836 (2015–2016 Reg. Sess.) June 16, 2016 (Enrolled Bill Report).)

But the court overreads the significance of the fact that the statute speaks only of notice to the state. After all, the state is in the best position to identify plaintiffs in overlapping PAGA actions, as all plaintiffs are required to provide notice to the LWDA prior to commencing an action. (Lab. Code, § 2699.3, subd. (a)(1).) In addition, the LWDA provides a form of general notice to other PAGA plaintiffs through its searchable database of pending PAGA actions. (See State of California Department of Industrial Relations, *Private Attorneys General Act (PAGA) Case Search* <https://cadir.my.salesforce-sites.com/PagaSearch/> [as of Aug. 1, 2024]; all Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.) This database includes copies of the complaints and proposed settlements received by the LWDA. (See, e.g., *id.*, at <https://cadir.my.salesforce-sites.com/PagaSearch/PAGACaseDetails?id=a1Bt000000018yaEAA> [as of Aug. 1, 2024].) Thus, in practice, notice to the state facilitates notice to PAGA plaintiffs in overlapping actions. Further, plaintiffs in pending PAGA actions may also receive notice of overlapping actions through notices of related actions. (See Cal. Rules of Court, rule 3.300(b).)

Moreover, although the text and legislative history of Labor Code section 2699, subdivision (s)(2) (formerly subdivision (*l*)(2)), support the inference that the Legislature assigned the LWDA (and trial courts) the responsibility for reviewing settlements, the fact that the state has primary responsibility for enforcing the Labor Code and oversight of the initiation of PAGA actions does not answer the question before us. The state's "primacy over private enforcement efforts" is an inherent feature of the PAGA scheme. (*Iskanian, supra*, 59 Cal.4th at p. 379.) Just as that primacy does not preclude the prosecution of private actions to vindicate the state's interests, the Legislature's assignment of responsibility for settlement review to the LWDA does not preclude deputized PAGA plaintiffs from assisting the LWDA with this function through generally available procedural devices like intervention and vacatur. It is true that the legislative history focuses on the LWDA's role and does not mention intervention by PAGA plaintiffs as a means of settlement oversight. (Maj. opn., *ante*, at p. 37.) But the statutes on intervention and related procedures were part of the background law against which the Legislature enacted the settlement notice provision. Because "the Legislature 'is deemed to be aware of existing laws and judicial constructions in effect at the time legislation is enacted' " (*People v. Frahs* (2020) 9 Cal.5th 618, 634), the better inference is that the Legislature sought to strengthen the LWDA's oversight role *even with* the availability of intervention by private plaintiffs.

The "purposes of intervention" include "protect[ing] the interests of those who may be affected by the judgment" and "obviat[ing] delay and multiplicity of actions." (*County of San Bernardino v. Harsh California Corp.* (1959) 52 Cal.2d 341, 346;

accord *People v. Superior Court (Good)* (1976) 17 Cal.3d 732, 736.) As we have explained, courts have discretion to permit a real party in interest to intervene under section 387 when the state is already represented by a law enforcement agency, even when it may result in delayed proceedings, on the basis that "those protected by the legislation should hardly be excluded from the very action brought to vindicate their interests unless circumstances compel exclusion." (*Good*, at p. 737.) Today's decision, which requires the same representative PAGA claims to be prosecuted in separate actions, runs counter to section 387 case law construing the intervention statute liberally (e.g., *Crestwood Behavioral Health, Inc. v. Lacy* (2021) 70 Cal.App.5th 560, 572) and to the civil procedure statutes more generally, which facilitate (even when they do not mandate) the prosecution of the same claims in a simple action (e.g., §§ 378 [permissive joinder of plaintiffs], 389 [compulsory joinder of plaintiffs]).

As another basis for its decision, the court says several "complex and unsettled questions" would arise if a PAGA plaintiff could intervene in the parallel action of another plaintiff, such as who would direct the negotiations and how attorney's fees would be allocated. (Maj. opn., *ante*, at p. 42.) However, "[i]f a movant meets the requirements for mandatory intervention, 'the fact that such intervention would add to the complexity of the action . . . is of no moment.' " (*King v. Pacific Gas & Electric Co.* (2022) 82 Cal.App.5th 440, 449.) In any event, such complexity arising from multiparty litigation is not new to our trial courts, nor would it be unique to PAGA actions. Other qui tam statutes contemplate the intervention of multiple representatives of the state in a single suit. (See, e.g., Gov. Code, § 12652, subd. (c)(8)(B); Ins. Code, § 1871.7, subd. (f)(3).)

Although the court and my concurring colleagues note that other qui tam statutes prohibit parallel private actions (maj. opn., *ante*, at pp. 42–43; conc. opn. of Kruger, J., *ante*, at pp. 1–2), that observation is of no consequence here, where it is undisputed that PAGA authorizes parallel suits by private plaintiffs. Moreover, the court does not explain why trial courts would find it more difficult to evaluate intervention motions when the representatives of the state are private attorney generals than when the multiple state representatives are government officials, as in other qui tam contexts. (See maj. opn., *ante*, at p. 43.) Trial courts are just as equipped here as in other contexts to determine which complaints in intervention in parallel actions meet the criteria in section 387. (See *Accurso, supra,* 94 Cal.App.5th at pp. 1154–1155, review granted; see also *Callahan, supra*, 42 F.4th at pp. 1020–1023 [federal district courts are equipped to make such determinations under Rule 24 of the Federal Rules of Civil Procedure].)

"Whether to allow permissive intervention in a particular case ' "is best determined by a consideration of the facts of that case" [citation], and the decision is ordinarily left to the sound discretion of the trial court.' " (*State Water Bd. Cases* (2023) 97 Cal.App.5th 1035, 1043; see also *Squire v. City and County of San Francisco* (1970) 12 Cal.App.3d 974, 978 ["Intervention . . . is not a matter of absolute right but is discretionary with the court"]; *Cuneo v. Superior Court for Merced County* (1963) 213 Cal.App.2d 452, 454; *Merriam v. Bryan* (1929) 36 F.2d 578, 579.) Instead of deferring to the sound judgment of our trial courts, which have handled intervention motions in California for over a century, today's opinion withdraws from the courts and PAGA plaintiffs a basic tool of civil procedure.

The court purports to locate additional support for its decision in general agency principles. (Maj. opn. at pp. 22–23, fn. 11.) The court suggests that a PAGA plaintiff, which we have referred to as an "agent" of the state (*Arias, supra*, 46 Cal.4th at p. 986), possesses only the implied authority the " 'principal' " intended it to have. (Maj. opn., *ante*, at p. 23, fn. 11.) But the statute does not refer to PAGA plaintiffs as agents, and PAGA plaintiffs do not have a true agency relationship with the LWDA. (See Rest.3d Agency, § 1.01, com. b.; *Accurso, supra*, 94 Cal.App.5th at p. 1149, review granted.) "An essential element of agency is the principal's right to control the agent's actions . . . . [T]he principal initially states what the agent shall and shall not do, in specific or general terms. Additionally, a principal has the right to give interim instructions or directions to the agent . . . ." (Rest.3d Agency, § 1.01, com. f, subd. (1).) PAGA contemplates only the state's control over a plaintiff's ability to "commence a civil action." (Lab. Code, § 2699.3, subd. (a)(2)(A).) When a PAGA plaintiff seeks to enter a settlement, the state cannot exercise control over what the plaintiff "shall and shall not do." (Rest.3d Agency, § 1.01, com. f, subd. (1).) The statute only "permit[s] the [LWDA] to comment on . . . settlement provisions, and the court shall grant the [LWDA]'s commentary the appropriate weight." (Lab. Code, § 2699.3, subd. (b)(4).)

The court further reasons that its holding is consistent with the Legislature's intent to increase settlement oversight without making PAGA litigation more difficult. (Maj. opn., *ante*, at pp. 38–40, citing Enrolled Bill Report, *supra*, at p. 2.) But the Legislature's statement that it did not intend for the bill "to curtail or make it harder to *pursue PAGA litigation*" (Enrolled Bill Report, *supra*, at p. 2, italics added) is entirely consistent

with the Legislature's goal of *disrupting settlements.* (*Id.* at p. 6 ["The requirement for court approval of all settlements . . . will make it *far more difficult* for parties to settle PAGA cases simply by agreeing to dismiss PAGA claims or by focusing exclusively on the interests of the plaintiffs' counsel, named plaintiffs, and defendant, to the exclusion of other employees and former employees whose interests purportedly are being represented"], italics added.) Indeed, today's decision will likely make it harder to pursue PAGA litigation because plaintiffs and their attorneys know that defendants can settle the state's representative claims for the lowest price with no possibility of intervention by plaintiffs with overlapping claims, including plaintiffs who may have spent considerably more time in litigation. And while it is true that intervention by the LWDA or other PAGA plaintiffs may prolong settlement negotiations in a given suit, the bill history makes clear that the Legislature knowingly traded expediency in exchange for appropriately valued agreements.

Finally, the court reaches its conclusion that intervention and vacatur by PAGA plaintiffs is barred despite the DLSE's representation that it does not have capacity to review all proposed settlements and requires the assistance of PAGA plaintiffs to bring deficiencies in other settlements to its and the trial courts' attention. The DLSE asserts that in 2021, "[P]laintiffs submitted 2,978 notices of proposed settlements of PAGA claims (about 245 per month). The DLSE cannot identify every deficient settlement, let alone litigate challenges to these settlements . . . ." The DLSE argues that "the LWDA must also be able to rely on aggrieved workers to protect workers from deficient settlements."

Today's opinion dismisses the DLSE's concern as unsupported by "any *evidence*." (Maj. opn., *ante*, at p. 37.) The court notes that the Legislature allocated additional funds to support the LWDA's enforcement efforts in 2016 on top of the civil penalties it receives through PAGA litigation (*id.* at pp. 36–37), and it quotes at length from university reports that the court formally declines to notice (*id.* at pp. 31–32, fn. 13).

But we have relied on amicus briefs submitted by the DLSE in the past (see, e.g., *Kilby v. CVS Pharmacy, Inc.* (2016) 63 Cal.4th 1, 15–16, 20), and we consistently accord respect to the DLSE's views (see, e.g., *Huerta v. CSI Electrical Contractors* (2024) 15 Cal.5th 908, 935–936). No one disputes — indeed, the court does not deny — that the DLSE is well positioned to assess the LWDA's capacities. And no appellate factfinding is needed to observe that the DLSE's assessment is fully consistent with the Legislature's express recognition of the role of deputized PAGA plaintiffs in augmenting the state's limited capacity to vigorously enforce the Labor Code. (See Stats. 2003, ch. 906, § 1, subds. (c)–(d); see also *Kim, supra*, 9 Cal.5th at p. 86 ["The Legislature's sole purpose in enacting PAGA was 'to augment the limited enforcement capability of the [LWDA] by empowering employees to enforce the Labor Code as representatives of the Agency.' "].)

The court seems to think that even though the PAGA framework is entirely premised on the LWDA's limited capabilities, it is somehow possible that the LWDA has sufficient resources to monitor the thousands of PAGA settlements proposed each year and to intervene where appropriate. I suspect this would come as a surprise to the Legislature that enacted PAGA as well as the Legislature that enacted the settlement notice provision in 2016 (as well as the

Legislature today, for that matter).  Virtually all our decisions construing PAGA have recognized and affirmed PAGA's core premise that state resources are too limited to ensure proper Labor Code enforcement.  We have not previously questioned that premise, and there is no reason for the court to start now.

### III.

Today's decision is an aberration, but one that the Legislature can correct.  The LWDA is faced with a significant task:  "protect[ing] and improv[ing] the health, safety, and economic well-being of over 18 million wage earners."  (State of California Department of Industrial Relations, *About Us* <https://www.dir.ca.gov/aboutdir.html> [as of Aug. 1, 2024].)  PAGA was intended to augment the LWDA's limited law enforcement capacity.  Although the Legislature enacted PAGA against a legal backdrop that permits civil litigants — and deputized PAGA plaintiffs are no exception — to make use of the full panoply of procedural tools, the court withdraws two mechanisms, intervention and vacatur, that play a critical role in ensuring fair settlements for aggrieved employees asserting violations of the Labor Code.  In so holding, the court puts the onus back on the Legislature to ensure that future PAGA settlements are not sold to the lowest bidder.

The Legislature may wish to consider whether the LWDA's capacity for oversight of PAGA settlements is sufficient and whether any insufficiency can realistically be remedied by allocation of more resources.  In assessing the LWDA's capacity, the Legislature may consider the volume of claims associated with each of the several other PAGA oversight functions the agency plays, including reviewing new claim notices, employer response or cure notices, amended claim notices, employees'

cure disputes, court complaints, court orders or judgments, and other responses or documents submitted to the LWDA. (See State of California Department of Industrial Relations, *Private Attorneys General Act (PAGA) — Filing* <https://www.dir.ca.gov/Private-Attorneys-General-Act/Private-Attorneys-General-Act.html> [as of Aug. 1, 2024].) The Legislature may also wish to study the reasonableness of recent PAGA settlements. With such information, the Legislature can consider appropriate responses to the substantial risk of weakened Labor Code enforcement that today's opinion has regrettably wrought.

I respectfully dissent.


**LIU, J.**

**I Concur:**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Turrieta v. Lyft, Inc.

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 69 Cal.App.5th 955
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S271721
**Date Filed:** August 1, 2024

_____

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Dennis J. Landin

_____

**Counsel:**

Lichten & Liss-Riordan, Shannon E. Liss-Riordan and Anne Kramer for Movant and Appellant Million Seifu.

Outten & Golden, Jahan C. Sagafi, Laura Iris Mattes, Adam Koshkin; Olivier Schreiber & Chao, Olivier & Schreiber, Monique Olivier, Christian Schreiber and Rachel Bien for Movant and Appellant Brandon Olson.

Teukolsky Law and Laren Teukolsky for California Employment Lawyers Association as Amicus Curiae on behalf of Movant and Appellant Brandon Olson.

Michael L. Smith and Alec Segarich for Department of Industrial Relations, Division of Labor Standards Enforcement, as Amicus Curiae on behalf of Movants and Appellants.

The Graves Firm, Allen Graves, Jacqueline Treu and Adrian Hernandez for Plaintiff and Respondent.

Horvitz & Levy, Christopher D. Hu, Peder K. Batalden, Felix Shafir; Keker, Van Nest & Peters, R. James Slaughter, Erin E. Meyer, Ian Kanig and Morgan E. Sharma for Defendant and Respondent.

Paul, Plevin, Sullivan & Connaughton, George S. Howard, Jr., and Jeffrey P. Michalowski for Employers Group and The California Employment Law Council as Amici Curiae on behalf of Plaintiff and Respondent and Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Monique Olivier
Olivier & Schreiber LLP
475 14th Street, Suite 250
Oakland, CA 94612
(415) 484-0980

Allen Graves
The Graves Firm
122 North Baldwin Avenue, Main Floor
Sierra Madre, CA 91024
(626) 240-0575

Felix Shafir
Horvitz & Levy LLP
3601 West Olive Avenue, 8th Floor
Burbank, CA 91505
(818) 995-0800